THE PEOPLE OF THE STATE OF NEW YORK ex rel. ALONZO A. BURBY, Respondent, *v.* LANSING M. HOWLAND et al., Composing the Town Board of the Town of Fort Edward, Appellants.

1. CONSTITUTIONAL LAW — OFFICE OF JUSTICE OF THE PEACE. The office of justice of the peace in towns is a constitutional office and, therefore, cannot be abolished by the legislature, either directly or indirectly, so long as the town exists.

2. DIMINUTION OF JUSTICES' DUTIES IN ONE TOWN. It is not in the power of the legislature to enact that justices of the peace in the state at large shall have certain powers and duties, except in one certain town, and that there only they shall not have those duties, and if they voluntarily attempt to discharge them, shall have no power to enforce their judgments.

3. UNCONSTITUTIONALITY OF ABOLITION OF JUSTICES' CRIMINAL JURISDICTION — TOWN OF FORT EDWARD. Sections 19 and 20 of chapter 22 of the Laws of 1896, relating to the town of Fort Edward only, which, while not in terms taking from the justices of the peace in the town the jurisdiction conferred upon such officers in the state at large, relieve them of the duty of acting in criminal matters, either as a magistrate or a court, relieve peace officers of the duty of serving such justices' criminal process and executing their commitments, and withdraw from the justices and from the peace officers all compensation for services rendered in the justices' criminal matters, are in conflict with article 6 of the Constitution and void, being in effect an attempt to abolish the criminal jurisdiction of the justices in the town, which would be, to that extent, an abolition of the office itself.

*People ex rel. Burby* v. *Howland,* 17 App. Div. 165, affirmed.

(Argued January 24, 1898; decided March 8, 1898.)

APPEAL from an order of the Appellate Division of the Supreme Court in the third judicial department, entered August 27, 1897, affirming an order of the Special Term directing the issue of a peremptory writ of mandamus.

The town of Fort Edward, in Washington county, embraces a territory about ten miles long and three or four miles wide, with a population of 6,000 people. It contains two villages, Fort Edward, with a population of nearly 4,000, and embracing a territory of about one square mile, and Fort Miller, a

very small place, eight or nine miles from Fort Edward. During the year 1896 it had four justices of the peace, of whom the relator was one, and five constables, and all these officers had duly qualified and were acting as such. In March of that year, pursuant to chapter 22 of the Laws of 1896, George Turner, one of said justices of the peace, was elected police justice of said town, and Charles W. Dean, one of the constables, was elected police officer thereof, and both promptly assumed the duties of their respective offices and continued to discharge the same during the remainder of the year.

Between the first of June and the fifteenth of October, 1896, the relator, who was elected in March, 1894, performed services for said town as a justice of the peace in criminal actions and proceedings, and on the 12th of November following rendered a bill therefor, duly verified, to the town board, which refused to audit any part thereof for the reason, as certified by the officers composing the board, "that chapter 22 of the Laws of 1896 prohibits the audit and allowance of the same." It is not denied that the services were in fact rendered or that the fees charged are at the rate allowed by law.

Upon a petition showing these, with other facts, an application was made by the relator at a Special Term of the Supreme Court, on notice to the members of the board, for a peremptory writ of mandamus to compel them to audit and allow his bill, and the court, after hearing both parties, granted the motion and issued the writ. The order granting the application having been affirmed by the Appellate Division the defendants appealed to this court.

*Edgar T. Brackett* and *George Scott* for appellants. A statute will be declared unconstitutional only when it can be shown beyond reasonable doubt that it conflicts with the fundamental law; and until every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible, the statute will be upheld. (*People ex rel.* v. *Bd. Suprs.*, 147 N. Y. 1.)

The act in question does not offend the provisions of article 3, section 18, of the Constitution, which provides that "the legislature shall not pass a private or local bill in any of the following cases: Creating, increasing or decreasing fees, percentage or allowances of public officers during the term for which said officers are elected or appointed." (Const. N. Y. art. 10, § 9; *Hiller* v. *B. & M. R. R. R. Co.*, 70 N. Y. 223; Code Civ. Pro. § 2861; Code Crim. Pro. §§ 56, 62; 109 N. Y. 170; *Sill* v. *Vil. of Corning*, 15 N. Y. 297; *Brandon* v. *Avery*, 22 N. Y. 469; *People ex rel.* v. *Duffy*, 49 Hun, 276; *Astor* v. *Arcade R. Co.*, 113 N. Y. 93; *City of Rochester* v. *Briggs*, 50 N. Y. 553; *Matter of Knaust*, 101 N. Y. 194; *Bd. Water Comrs.* v. *Dwight*, 101 N. Y. 9; *Ensign* v. *Barse*, 107 N. Y. 329; *Prentice* v. *Weston*, 47 Hun, 121; *People ex rel.* v. *Banks*, 67 N. Y. 568; 69 N. Y. 557.) The act does not offend the provisions of section 18 of article 6 of the Constitution. (*People ex rel.* v. *Terry*, 108 N. Y. 1; *Brandon* v. *Avery*, 22 N. Y. 469; *Curtin* v. *Barton*, 139 N. Y. 505; *People ex rel.* v. *Porter*, 90 N. Y. 68.)

*Lewis E. Carr* and *Edgar Hull* for respondent. The writ of mandamus was the appropriate remedy for the relator. (*People ex rel.* v. *Suprs. of Delaware Co.*, 45 N. Y. 196, 200, 206; *People ex rel.* v. *Barnes*, 114 N. Y. 317; *People ex rel.* v. *Town Auditors of Elmira*, 82 N. Y. 80.) The act of 1896 offends the constitutional provision requiring that the subject of private or local bills shall be expressed in the title, because the title to this act is deceptive and misleading, and so within the mischief the constitutional provision was intended to prevent. (*Johnston* v. *Spicer*, 107 N. Y. 185; *Astor* v. *Arcade R. Co.*, 113 N. Y. 93; *People ex rel.* v. *Suprs. of Chautauqua*, 43 N. Y. 10; *People ex rel.* v. *Hills*, 35 N. Y. 449; *Kerrigan* v. *Force*, 68 N. Y. 383; *Ferguson* v. *Ross*, 126 N. Y. 459.) The act of 1896 is invalid because it in effect destroys a constitutional office. It aims to prohibit the justices of the peace of the town of Fort Edward

from discharging their duty, and so, by indirection, brings about what the legislature had no power to do. (Const. N. Y. art. 6, §§ 17, 22; *People ex rel.* v. *Albertson*, 55 N. Y. 50; *Geraty* v. *Reid*, 78 N. Y. 64; *People ex rel.* v. *Green*, 56 N. Y. 466; Black on Const. Law, 252; *People ex rel.* v. *Nostrand*, 46 N. Y. 375; *Reid* v. *Smoulter*, 128 Penn. St. 324; *People ex rel.* v. *Keeler*, 29 Hun, 175; *State* v. *Brunst*, 26 Wis. 414; *Warner* v. *People ex rel.*, 2 Den. 272; *Comm. ex rel.* v. *Mann*, 5 W. & S. 403.) The act is invalid because it creates in the town of Fort Edward a court, not local and of inferior jurisdiction, but equal to, and co-ordinate with, the courts recognized in the Constitution. (*Sill* v. *Vil. of Corning*, 15 N. Y. 297; *Brandon* v. *Avery*, 22 N. Y. 469; *People ex rel.* v. *Terry*, 108 N. Y. 1; *Waters* v. *Langdon*, 40 Barb. 408; *Geraty* v. *Reid*, 78 N. Y. 64; *Vil. of Deposit* v. *Vail*, 5 Hun, 310; *Bocock* v. *Cochran*, 32 Hun, 521; *Ziegler* v. *Corwin*, 12 App. Div. 60; *Baird* v. *Helfer*, 12 App. Div. 23; *Pierson* v. *Fries*, 3 App. Div. 418.) The elements of the act in question which are invalid constitute so material a part of the scheme embodied in it, that the whole act must fall. (*Lawton* v. *Steele*, 119 N. Y. 226, 241; *People ex rel.* v. *Kenney*, 96 N. Y. 294, 303; *Matter of Vil. of Middletown*, 82 N. Y. 196; *Matter of N. Y. & L. I. B. Co.*, 148 N. Y. 540; *Rathbone* v. *Wirth*, 150 N. Y. 459.)

VANN, J. The question presented by this appeal is whether certain sections of chapter 22 of the Laws of 1896, entitled "An act to provide for the better administration of justice in the town of Fort Edward, in the county of Washington," are in conflict with the Constitution of the state. By its first twelve sections this statute provided for the election at the annual town meeting in the year 1896 of a police justice to hold office for two years, with a salary of $300 per year, and declared that "said office shall be one of the town offices of said town." He was given the same jurisdiction in all criminal

cases and proceedings as is possessed by justices of the peace in said town, and it was made his duty "to hear, try and determine all criminal cases and proceedings which a Court of Special Sessions has power to hear, try and determine." On or before the fifth day of each month he was required to pay over to the supervisor of the town, for the use of the poor thereof, all moneys received by him for costs, charges, fees or fines in any proceedings before him for the month immediately preceding.

The next six sections provided for the election at the same time of a police officer "as town officer of said town," at a salary of $30 per month, with all the powers, duties and liabilities that constables of said town "have with regard to all criminal matters and all proceedings of a criminal nature." All fees received by him were to be paid over once a month to the supervisor for the use of the poor of the town, and both he and the police justice were required to be resident electors of the town. Sections 19 and 20 of said act are as follows :

"§ 19. The sheriff, under sheriff, deputy sheriffs, or constables elected or appointed in the county of Washington, or the village or town of Fort Edward, or any railroad officer or detective employed by any railroad company whose road extends into or runs through said county of Washington, shall not, as such, be compelled to serve within the town of Fort Edward, or village of Fort Edward, any summons, warrant, subpœna, commitment, order, notice, paper or process whatever, issued or directed by the police justice of said town, or village, or any justice of the peace residing or doing business therein, in execution of the laws of this state for the prevention of crime and the punishment of criminal offenders, or of the police laws or regulations of the state, or in any proceedings collateral to or connected with the execution of such general laws or regulations, or of the by-laws, rules, regulations or ordinances of said town, or of said village aforesaid ; nor shall the county of Washington, or any of the towns therein, or the village of Fort Edward, be chargeable with, or in any way

1898.]    People ex rel. Burby *v.* Howland.    **275**

N. Y. Rep.]        Opinion of the Court, per Vann, J.

liable to pay any such sheriff, under sheriff, deputy sheriff, constable, or railroad officer or detective, any fees for services rendered, or disbursements paid or incurred, under or by virtue of such warrants, subpœnas, commitments, order, notice, paper or process whatever.

"§ 20. No justice of the peace of the town of Fort Edward or police justice of said village shall be compelled to issue any summons, warrant, subpœnas, commitment, order, notice, paper or process whatever, for any criminal offense, within said town, nor shall the county of Washington, or any town therein, or the village of Fort Edward, be chargeable with, or in any way liable to pay any such justice of the peace, or police justice of such village, any fees for any services rendered, or disbursements paid or incurred, under or by virtue of any such warrants, subpœnas, commitments, orders, notices, papers or process whatever."

The object of this act, as claimed by the appellants, is "the abolition of fees and the consequent saving to the taxpayers" of the town of Fort Edward; but, as claimed by the respondents, it is the abolition *pro tanto*, and by an indirect method, of the office of justice of the peace in said town. The main question presented for decision is, whether the sections quoted above from the act of 1896 are in violation of article 6 of the Constitution of this state.

That article establishes the judiciary of the state the same as previous articles had established the legislative and executive departments of government. By its 17th section it provides that "the electors of the several towns shall, at their annual town meetings, * * * elect justices of the peace, whose term of office shall be four years. * * * Justices of the peace and judges or justices of inferior courts not of record, and their clerks, may be removed for cause, after due notice and an opportunity of being heard, by such courts as are or may be prescribed by law. Justices of the peace and district court justices may be elected in the different cities of this state in such manner, and with such powers, and for such terms, respectively, as are or shall be prescribed by law."

It is provided by section 20 of the same article that "no judicial officer, except justices of the peace, shall receive to his own use any fees or perquisites of office;" by section 22, that "justices of the peace and" certain other local judicial officers "in office when this article takes effect, shall hold their offices until the expiration of their respective terms;" and by section 23 that "Courts of Special Sessions shall have such jurisdiction of offenses of the grade of misdemeanors as may be prescribed by law." These provisions, except section 22, are not new as they are continued from the Constitution of 1846, which was not abolished, but was revised by the convention of 1894 and the subsequent action of the People. (See the Constitutions of 1777, § 28; 1821, art. IV, § 7; 1846, art. VI, §§ 11 and 17; 1 R. S. 110.)

The office of justice of the peace came down to us from remote times. It existed in England before the discovery of America, and it has existed here practically during our entire history, both colonial and state, at first with criminal jurisdiction only, but for more than two centuries past with civil jurisdiction also. (1 Col. Laws, 226, Act of May 6, 1691; 2 Col. Laws, 964, Act of Dec. 16, 1737; 3 Col. Laws, 1011, Act of Dec. 7, 1754; 4 Col. Laws, 296, Act of Dec. 16, 1758; 5 Col. Laws, 209, Act of Feb. 16, 1771; Law Dict. tit. Justice of the Peace, Tomlins, Burrill, Black and Anderson.) It exists in every state of the Union and is regarded as of great importance to the people at large, as it opens the doors of justice near their own homes, and not only affords a cheap and speedy remedy for minor grievances as to rights of property, but also renders substantial aid in the prevention and punishment of crime. The office as it now exists in towns was established by the Constitution, which does not in express terms say what a justice of the peace shall be. As, however, the office was well known when the Constitution was adopted, it is presumed that the framers thereof and the People meant to establish it as an office with such civil and criminal jurisdiction, within the limitations of that instrument, as the legislature saw fit to confer upon it. As it has always had criminal juris-

diction, and was an existing office with such jurisdiction when each Constitution was adopted, it is at least doubtful whether the legislature has any power to deprive it of criminal jurisdiction altogether, since that would tend to partially abolish the office as it had been known for time out of mind.  A constitutional office cannot be abolished by legislation having that result as a direct object, although it has been held that, under the provision of the Constitution authorizing the legislature to create cities and villages, it may abolish a town altogether, even if the effect is to deprive a justice of the peace of his office. (*Matter of Gertum,* 109 N. Y. 170.) The court, however, was careful to bound such legislation by the limitation of good faith and a proper constitutional object. Thus, Chief Judge Ruger, in delivering the opinion, said : " It is undoubtedly beyond the power of the legislature, by direct legislation, to abolish the office of justice of the peace in towns, or shorten their terms of office so long as the town exists, but they have an unquestioned right to alter and change the limits of their jurisdiction, or abolish the town organization altogether, provided it be done in good faith, and for proper constitutional objects.  The whole force and effect of the provision in relation to justices is satisfied by enforcing it, so long as there is a town organization in existence authorized under the Constitution to elect justices of the peace and requiring the performance of their functions in the government of the town."

Not only is the office itself placed beyond the reach of hostile legislation, but also the term thereof, the method of filling it, and, by implication, the method of removing an incumbent.  As was well said by the learned Appellate Division in deciding this case, " when the Constitution has fixed the term of office and prescribed the cause for which and the method by which an incumbent of such office may be removed, such cause and method are exclusive, and it is beyond the power of the legislature to remove or suspend him from office for any other cause or in any other method. (*Rathbone* v. *Wirth,* 150 N. Y. 459, 475 ; *Lowe* v. *Common-*

*wealth,* 3 Metc. [Ky.] 237 ; Black's Const. Law, 255.)" The Constitution does not prescribe the powers or duties of justices of the peace in towns, but leaves that to be done by general laws, which, hitherto, have been uniform, applying alike to all justices of the peace in towns throughout the state. Their civil jurisdiction is prescribed by the Code of Civil Procedure, and includes most common-law actions where the sum claimed does not exceed two hundred dollars. (§§ 2861–2864.) Their criminal jurisdiction, as committing magistrates, covers crimes of all grades, and as justices holding Courts of Special Sessions, crimes of the grade of misdemeanor. (Code Crim. Pro. §§ 56, 62, 147, 156.) A justice of the peace in towns, therefore, may be defined as a constitutional judge elected by the People for a fixed term, protected from removal except by a judicial tribunal, on notice and for cause, with civil jurisdiction in most actions where the sum claimed does not exceed two hundred dollars, and with criminal jurisdiction to apprehend and commit for all crimes, and to try and convict in cases of misdemeanor. Does this define the position held by the relator as hampered and limited by the act of 1896 ? What does that act attempt to do with justices of the peace in the town of Fort Edward ? While it does not directly or in terms take away from them the jurisdiction conferred by law upon such officers throughout the state, the effect is the same, so far as criminal jurisdiction is concerned, as if the office were absolutely abolished. ( *Warner* v. *People*, 2 Den. 272, 281.) In three respects, each of which is essential to effective jurisdiction, the office is attacked : 1. By expressly removing the duty to enforce the criminal law either as a magistrate or as a court. 2. By virtually prohibiting all peace officers from serving process or executing commitments. 3. By taking away all compensation for services rendered in criminal matters. This is done by legislation which discriminates in these respects against justices of the peace in one town in the entire state and cuts down the power of this constitutional office in that town alone, leaving it unaffected elsewhere. Thus a judicial officer, named in the Constitution, elected

for a term fixed by the Constitution, with jurisdiction to act conferred by general laws, and by those laws entitled to fees for his services, while not in theory deprived of the power to act, is practically prevented from acting by a special statute, the direct object of which is to accomplish that result. Can the legislature leave these officers with jurisdiction to act, and yet not only relieve them of the duty of acting, but virtually render judicial action impossible by preventing all executive officers from serving their process, and by depriving them of all compensation for acting? Is not this an interference with the office itself? If a substantial part of the power of four justices of the peace out of several thousand in the state is taken away from them, are they still justices of the peace within the meaning of the Constitution? Does not the prohibition against taking fees operate as a substantial abolition of criminal jurisdiction, and to that extent as an abolition of the office itself? (*Reid* v. *Smoulter*, 128 Penn. St. 324.) Does not the taking away of the duty to act have the same effect? Does not the withdrawal of compensation to peace officers for acting, as well as the abolition of their duty to act, render justices of the peace powerless to discharge their duties, and to that extent abolish the office? While bare jurisdiction may exist, will it be exercised when it is no longer a duty, and, if exercised, it must be without compensation? (*Commonwealth* v. *Mann*, 5 Watts & S. 403, 409.) Can it be exercised when the peace officers are bound and hamstrung? A judicial officer cannot serve his own papers, and if he is deprived of the right to compel executive officers to serve them, does he continue to be a judicial officer? Even if criminal process were issued by a justice of the peace in the town of Fort Edward, no officer could be compelled to serve it, and, after a lawful judgment of conviction, the commitment of the offender might be of no avail for the want of some one to execute it. The hands of a constitutional judge are thus tied as completely as legislation can tie them, so far as the administration of the criminal law is concerned.

The Constitution created Courts of Special Sessions, and the legislature, by general laws, defined the criminal jurisdiction of those courts, authorized justices of the peace to hold them, and prescribed the compensation they were to receive therefor, yet, an act, applicable only to a single town in the state, virtually deprives these constitutional justices of the power to hold these constitutional courts, and takes from them the compensation to which, otherwise, they would be entitled by law. While the legislature has power to increase or diminish the jurisdiction of these officers generally, can it confer full judicial power upon all, and yet not only take away judicial duty from some, but even render judicial action by them practically impossible, without affecting the office itself? If this can be done as to criminal actions, why can it not be done as to civil actions, also, and thus leave justices of the peace officers in name only? It is conceded that the legislature cannot abolish the office directly, and, if not, can they do so indirectly? Is there any difference between abolishing an office altogether and practically preventing the incumbent from discharging the functions thereof? "Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision." (*People ex rel. Wood* v. *Draper*, 15 N. Y. 543.) As was said by Judge ALLEN in an important case, "an act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden." (*People ex rel. Bolton* v. *Albertson*, 55 N. Y. 50, 55.)

When the main purpose of a statute, or of part of a statute, is to evade the Constitution by effecting indirectly that which cannot be done directly, the act is to that extent void, because it violates the spirit of the fundamental law. Otherwise the Constitution would furnish frail protection to the citizen, for

it would be at the mercy of ingenious efforts to circumvent its
object and to defeat its commands.   The main purpose of sec-
tions 19 and 20 of the act under consideration was to so cir-
cumscribe justices of the peace in one town of the state as to
prevent them from performing important official functions, and
to divert the business confided to them by general laws to a new
officer created by special act for the express purpose of doing
that business.   Thus it is made the duty of the new police jus-
tice to hear and determine all criminal cases which Courts of
Special Sessions have power to hear and determine, and the jus-
tices of the peace of the town, although still authorized to hold
those courts, are relieved of that duty, deprived of compensation
if they discharge it, and are prevented from discharging it
through inability to compel peace officers to obey their com-
mands.   The necessary effect of such legislation indicates its
object, which was to silence the justices of the peace and trans-
fer their duties to the police justice.   We think it is not in the
power of the legislature to enact that justices of the peace in the
state of New York shall have certain powers and duties, except
in the town of Fort Edward, and that there only they shall
not have those duties, and if they voluntarily attempt to dis-
charge them, shall have no power to enforce their judgments.
If this can be done as to one judicial officer named in the Con-
stitution, it can be done as to another, and the duties imposed
generally upon justices of the Supreme Court throughout the
state cannot only be altogether withdrawn as to certain justices,
but the power to discharge them withdrawn also.   The Code of
Criminal Procedure declares that justices of the Supreme Court,
justices of the peace and certain other judicial officers shall be
magistrates, and important criminal powers are expressly con-
ferred upon them, and, by implication, it is made their duty
to exercise those powers in a proper case.   (Code Crim. Pro.
§§ 147, 166.)   The legislature can, of course, amend and change
that statute by adding to or taking from those powers and
duties, but can it so amend it as to declare that it shall not be
the duty of justices of the Supreme Court residing in a cer-

36

**282**          People ex rel. Burby *v.* Howland.          [Mar.,

Opinion of the Court, per Vann, J.          [Vol. 155.

tain district to act as magistrates, and that, if they do so act, peace officers shall not be compelled to serve their warrants or enforce their commitments? Without directly taking away the power, can the duty be withdrawn and the power so undermined as to make it practically useless, and the office still be left intact?

The object of a written Constitution is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers. The safety of free government rests upon the independence of each branch and the even balance of power between the three. Unite any two of them and they will absorb the third with absolute power as a result. Weaken any one of them by making it unduly dependent upon another and a tendency toward the same evil follows. It is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men. It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others.

Nothing is more essential to free government than the independence of its judges, for the property and the life of every citizen may become subject to their control and may need the protection of their power. Not a contract is made except in reliance upon their ability to afford redress if it is violated. Men part with property upon the promise of their fellows, walk the streets by day and sleep in peace at night in the confidence that the silent and unseen power of the judiciary is always ready to protect their rights. Any legislation that hampers judicial action or interferes with the discharge of judicial functions is in conflict with the principles of the Constitution. Whenever a judge, however humble, is authorized by law to hold a criminal court, established by the Constitution, and to require executive officers to serve his warrants and enforce his judgments, the legislature cannot leave him

1898.]     People ex rel. Burby v. Howland.     283

N. Y. Rep.]     Opinion of the Court, per Vann, J.

the power to act, and withdraw from him the power of compelling obedience to his lawful mandates, without affecting his independence and depriving him of the essential powers of a judge.

On the 26th of June, 1896, the relator, upon complaint being made before him, issued a warrant and the offender was arrested, tried and sentenced to imprisonment. Thereupon the justice issued the usual commitment to a peace officer to take the person convicted to the county jail. But, according to section 19 of the act under consideration, he could not require that officer to obey the order, and the command of a judge to enforce a valid judgment became no more than a mere request to do so. He was thus obliged to coax those whom, if he was still a judge, he had the right to command, and the enforcement of a lawful judgment depended upon the good will of a constable. In other words, a judge, acting according to law in every respect, was by this legislation made dependent upon the favor of an executive officer in order to have his lawful commands obeyed. Is any argument necessary, under these circumstances, to show that the independence of the judge was destroyed? The lawful command of a judge is the command of the People of the state of New York, in their organized capacity under the Constitution, and the legislature has no power to say directly or indirectly that such a command shall not be obeyed. While, in many cases, it can take away the jurisdiction of the judge altogether, it cannot leave him clothed with full power to render judgment and then prevent him from causing that judgment to be enforced by saying to peace officers that they need not obey his lawful commands unless they choose to do so. If such legislation is sustained, the independence of the judiciary and the freedom of the law will depend upon the generosity of the legislature.

While we hesitate, as every court should, to set aside a solemn act of legislation, yet it is our high prerogative to defend the Constitution, and to protect the humblest judge from interference with his judicial functions in violation of its command. That duty we now discharge by adjudging that

sections 19 and 20 of chapter 22 of the Laws of 1896 are unconstitutional and void.

The order appealed from should be affirmed, with costs.

O'BRIEN, J. (dissenting, in this case and in *People ex rel. Ryan* v. *Board of Supervisors of Washington County*, p. 295). The courts below have held that sections nineteen and twenty of chapter 22 of the Laws of 1896 are in conflict with the Constitution, and, therefore, null and void. That is the only question presented by the appeal. The act is entitled " An act to provide for the better administration of justice in the town of Fort Edward in the county of Washington."

There are two records and two appeals involving the same question. They were heard and decided below as one case, and may now be discussed and reviewed in the same way. The relator Ryan is a constable of the town of Fort Edward, and also a deputy sheriff. In December, 1896, he presented to the board of supervisors of Washington county a bill of $12.90 for fees charged by him in the arrest and detention of two parties charged with crime in the town of Fort Edward. The board rejected the claim and refused to allow the same on the ground that, by the terms of the two sections of the act above mentioned, it was not a legal charge against the county or the town.

The relator Burby is one of the justices of the peace of the town of Fort Edward, elected in March, 1894, to fill a vacancy in an unexpired term ending the last of December, 1896. He presented to the town board, in the month of November, 1896, a bill of $24.75 for fees in proceedings before him as justice in certain criminal cases, which the board refused to allow on the ground that, by the terms of the two sections above referred to, the claim was not a legal charge against the town. On looking into the bill it will be seen that a large part of it consists of items for fees and services in the arrest and examination of persons charged with being what are there styled " state tramps." The courts below have held that both the justice and the constable were entitled to peremptory writs of

mandamus requiring the boards to audit and allow the bills, although the sections of the statute above referred to declare that they are not legal charges against the town or the county.

The nineteenth section enacts that no constable or deputy sheriff shall be required to serve any criminal process in the town, and that neither the town nor the county should be in any way chargeable for such services, or bound to pay the same.

The twentieth section provides that no justice of the peace should be required to issue any criminal process in cases within the town, and that neither the town or county should be chargeable with any fees or services rendered by a justice of the peace in criminal cases. All that the legislation in question did was to relieve the justice and the constable from all obligation to perform any duties in criminal cases arising in the town, and, having relieved them from the duties, deprived them of the right to charge the town or the county with fees for services which it was not their duty to perform.

The courts below have held that the legislature has no power to do this, since the Constitution stands in the way. On looking into the opinion of the learned judge at Special Term, and then into that of the learned judge who spoke for the Appellate Division, it is quite difficult to identify the particular constitutional provision which they supposed had been violated by the legislature in this case. The learned judge at Special Term was apparently of the opinion that the two sections violated that provision which forbids the legislature from passing any private or local bill *decreasing* the fees or allowances of public officers, while the learned judge at the Appellate Division virtually held that the sections were void because they practically abolished the ancient and constitutional office of justice of the peace in the particular town in question.

The act in question contains twenty-three sections, and in order to properly consider the questions presented by this appeal the general scope and purpose of the act, as a whole, must be kept in view. It provides for the election of a police justice in the town to be paid a salary of three hundred dollars per year, and confers upon him the same jurisdiction in

criminal cases as the justices of the peace of the town. It provides that the fees charged and received by him in criminal cases shall be paid over to the supervisor and not applied to his own use.

It then provides for the annual election of a police officer at a fixed compensation, with power to serve all criminal process, and requires him to serve all process issued by the police justice in criminal cases, and that the costs and fees therefor chargeable by law shall not be retained for his own use, but must be paid over to the supervisor.

It appears, therefore, that this rural town, with a population of six thousand people all told, and a territory ten miles in length and three or four miles wide, was provided with adequate machinery for administering the criminal law and preserving the public peace. The legislature decided that both economy and efficiency would be promoted by concentrating the duties of examining magistrate and conservators of the peace in this town in two persons, and relieving the justices of the peace and constables from all duties in that regard. That it was not a wanton or arbitrary interference with the local affairs of the town, appears from a very significant affidavit by the supervisor of the town and chairman of the board of supervisors of the county, which appears in the record and is not denied or questioned. The origin and purpose of this legislation is there clearly stated. It is shown that the statute was passed at the request and solicitation of a large majority of the people of the town, not only for the purpose of better conserving the cause of law and order, but of reducing the burden of taxation, by putting an end to the ill-considered and ill-advised action of justices of the peace and constables in soliciting and procuring tramps and vagrants to be arrested and committed for maintenance to the county jail for the sole purpose of enabling the justices and constables to present bills for services against the town or county, and that this practice had become such a grievous abuse that upon more than one occasion the Supreme Court had instructed the grand juries to inquire into the same. Moreover, he states

that after the act became a law, and at a public meeting of
the voters of the town, a resolution was unanimously passed
thanking the senator and assemblyman representing the town
in the legislature for their aid in procuring the enactment of
the law.    All this, however, counts for nothing, unless the
legislature had power to pass the bill and to enact the sections
in question.    It only shows that the will of the People, how-
ever flagrant may be the abuse which they attack, or however
laudable the reform which they advocate, must be subordinated
to the restraints of the fundamental law.

It appears that the justices of the peace and the constables,
like the silversmiths of Ephesus, were not satisfied with the
new law.    It damaged their business and reduced the oppor-
tunities for making money, and they appealed to the courts
for protection, and thus far they have had it, since it has
virtually been held that, after a justice of the peace or a con-
stable has been once installed in office, the lawmaking power
of the state is powerless to deprive them of the opportunity
of earning fees from the town or county in looking after
tramps and vagrants, and acting occasionally in the early
stages of other cases of a criminal character.    In this case the
justice and constable volunteered to perform services which it
was not their duty to perform, and yet, in defiance of the
express mandate of the legislature and of the will of the town
and county, they have been awarded compensation to the same
extent and in the same way as if the legislature had never
passed the act in question.

The claims of these two parties, when united, were less than
thirty-eight dollars, though the costs awarded upon the appli-
cation for the mandamus were fifty dollars, and it must be
quite clear that the only importance that the case could ever
assume is due to the fact that the parties and the courts below
regarded it as involving an important question of constitu-
tional law.

This brings us to the inquiry as to what provision of the
Constitution has been violated by the legislature in the passage
of this act.

1. It does not increase or decrease the fees or allowances of any public officer. The fees of a justice of the peace or a constable are just the same now in the town of Fort Edward as they were before the passage of the act. They have not been increased or diminished. The only change made is with respect to the persons entitled to receive them, and the uses to which such fees may be applied. The relators are affected by the act only in one respect, and that is that they cannot charge fees to the town or county when they volunteer to perform services in criminal cases, but the fees are still the same. The volume of the relators' business may have been diminished by this legislation, but the fees of justices of the peace and constables have not. If we inquire with respect to the amounts which a justice of the peace or constable may charge for any given service in the town of Fort Edward in criminal cases now, and find that they are the same as before the passage of the act, it must follow that the bill did not increase or decrease fees. The police justice and police officer created by the act are entitled to charge the same fees allowed before, and no more, but they must be paid to the supervisor for the benefit of the town, since these two officers are compensated by fixed salaries.

2. There is nothing in the body of the act not germane to the title. The two sections in question simply provide that justices or constables are relieved from all duties, and, therefore, may not charge fees to the town or county in criminal cases. That such provisions may properly be inserted in a private or local bill with such a title as that now before us, is too plain for argument.

3. The legislature had power to create the police court in the town under that provision of the Constitution which authorizes the creation of inferior local courts of civil and criminal jurisdiction. (Const. art. 6, § 18.)

4. The act does not in any sense or in any degree abolish the office of justice of the peace. The act does not touch the power, jurisdiction or authority of the justice in the slightest particular. He may now do everything that he could have

done before the act was passed.   He can exercise every power now that he could then.   In ancient times the office was an honorary one purely.   There were no fees attached to it, and no civil jurisdiction.   All that is found in statutes, and I suppose no one will deny that the legislature may repeal or modify the statutes.

The Constitution, while recognizing the office of justice of the peace, does not deal at all with either the jurisdiction or the fees.   All that is left to the legislatui e, and it may increase or diminish either the one or the other, or both, at pleasure.   This statute, therefore, does not in the slightest degree abolish or attempt, or even tend to abolish, the office of justice of the peace, unless, indeed, we hold that the office consists of what may be made out of it under the most favorable circumstances. The business of hunting down tramps and vagrants in the rural districts, in what are called hard times, is capable of being developed into a very high state of perfection, and if the justice and constable have a sort of vested right in what can be earned in that way, in the nature of property, beyond the power of the legislature, there must be certain guarantees in the Constitution that have never been discovered before.

When we consider the origin and history of the ancient and honorable office of justice of the peace, it occurs to me that it is now very much belittled, if not disgraced, by the contention that it is destroyed whenever the legislature attempts to interfere with the opportunities of the person who happens to hold it for the time being of making money out of it.   When this case is stripped of all irrelevant argument and illustration, the only objection that can be urged against the statute in question is that and nothing more.   The legislature has relieved the justice of a very small part of his duties, and has enacted that if he still insisted on performing them it should be without fees against the town or county as his predecessors in England did centuries ago.   That this was not only a constitutional, but, under the circumstances, a just and reasonable, exercise of power, I cannot doubt.   It is a mistake to suppose that the legislature is prohibited from abolishing the office of justice of

37

the peace. In point of fact, numerous statutes have been passed abolishing the office, and they have been held to be constitutional. (*Curtin* v. *Barton*, 139 N. Y. 513.) There is scarcely a city in the state where the office of justice of the peace did not once exist, but has been abolished by some form of legislation. The only provision of the Constitution upon the subject is to be found in art. 6, § 17, which simply provides that the *electors of the several towns* shall, at their annual town meetings, or at such other time and in such manner as the legislature may direct, elect justices of the peace whose term of office shall be four years. There is nothing whatever in the statute in question which in the slightest degree interferes with the right of the electors of the town to elect justices of the peace at town meetings, or that changes the tenure of the office. The electors must still elect justices of the peace in the same way and for the same term. They may not have quite so much criminal business to do hereafter as they have had heretofore, but surely that is no reason for pronouncing a solemn act of the legislature void. Indeed, when all the reasons for holding the statute invalid are fully weighed and measured it is quite difficult to treat or consider them all seriously. It is claimed that this legislation was enacted for the purpose of insidiously undermining the office of justice of the peace in this particular town. There is nothing on the face of the bill that gives the slightest color to this assertion, and surely we ought not to attribute to the legislators a purpose or motive in the enactment of a law that is not disclosed by the statute itself. (*Waterloo Mfg. Co.* v. *Shanahan*, 128 N. Y. 345.) The only purpose that the legislature had in the enactment of the statute was to relieve the taxpayers from claims upon the treasury of the town or county for services in colorable proceedings against tramps, vagrants and petty criminals — a business which, it seems, had been developed and enlarged to such an extent as to become an abuse and a scandal. This was the moving cause of the legislation according to the uncontradicted affidavit of the town authorities themselves, and they add that the statute, in its actual operation, has

accomplished the purpose by correcting the abuses. The motive and purpose of the enactment was, therefore, not only legal, but laudable. But this court has nothing to do with the motives of the legislature. It is not for the courts to attribute improper motives to the legislature any more than it is for the legislature to attribute improper motives to the courts for their judicial action. The question is one of power, and nothing else. When that simple inquiry is divested of all sentimental considerations, and the question divorced from the vigorous rhetoric and specious argument in which it is beclouded, the proper solution depends upon the correctness of a few propositions that seem to me so plain that every professional mind must accept them.

1. The legislature had the power to provide for the election of a police justice and a police officer in a town containing a considerable village, to fix their salaries, and confer upon them the powers of a justice of the peace and constable in criminal cases. That was the main purpose of the bill, and no one seriously questions the validity of the law in that respect.

2. Having gone so far, did the legislature have the power to relieve the people of the town from all legal obligation to pay fees for services in criminal cases, or compensation to local officers other than the sum fixed and designated as salaries? That is the power which it has exercised in the two sections of this statute which it is claimed are invalid, and I am not aware of any suggestion at the argument, or in the printed brief, that casts the slightest doubt upon the existence of this power in a lawmaking body which is supreme, except so far as restrained by the Constitution.

3. May the legislature, when providing for the administration of criminal justice in a town by a police justice and police constable, divest or relieve justices of the peace from all legal obligation or duty to entertain complaints or issue process in criminal cases? Inasmuch as every duty that can be performed by a justice of the peace in criminal cases is imposed by some statute or law enacted by the legislature the conclusion would seem to be irresistible that the power which

enacted the law may repeal it or modify it and the same power that imposed the duty can withdraw it.

If the legislature may lawfully exercise the powers specified in these three propositions then there can be no fair question with respect to the validity of the statute. That it does possess such power cannot, I think, be doubted, and to hold that the legislation in question abolishes the office of justice of peace is little less than asserting that an office is abolished whenever its pecuniary attractions are diminished by law. The particular justice who instituted this proceeding possessed after the passage of this statute every right and power as an officer that he possessed before, except the right to charge fees to the town or county in criminal cases, and to say that a statute which affects him to that extent only is void seems to me to be a proposition that cannot be seriously discussed, and I have discussed it only because able and eminent counsel who has presented the other view of the case has evidently the utmost confidence in the correctness of his position and, moreover, has impressed the court with the same view.

Suppose we hold this law to be constitutional and valid, will the office of justice of the peace in the town of Fort Edward be then abolished? Of course if the office of the relator in this case will be abolished so will that of all the other justices in the town in like manner, and the result must be, if the relator's contention is correct, that hereafter there can be no justices of the peace in the constitutional sense, in the town. If that be so, it must follow that the right to charge fees to the town and county in criminal cases is an essential part of the office itself, annexed to it by the Constitution in perpetuity and beyond the power of the legislature to change. I doubt if any one would seriously urge such a proposition, and yet it is what the relator's contention must really mean when analyzed. That office is abolished, or it is not abolished by this legislation, since it is impossible to conceive of any middle state between regular official existence and that statutory death which it is

claimed that the legislature has inflicted upon these town officers in violation of the Constitution. But the truth is, as every one must know, that no law providing for the election of justices of the peace has been interfered with in the slightest degree. They will still continue to be elected just the same as if the act had never been passed, and they will still possess the same powers and be authorized to do precisely the same things that they always did, except to draw fees from the town or county for services that they are not required to perform. The town has elected another officer at a fixed salary to do the things that the relator has volunteered to do, so that, from whatever point we start, we come back again to the inquiry whether the legislature has power to reduce the business of a justice of the peace by relieving him from all duties in criminal matters and the town or county from all obligation to pay him should he elect to do the things which he is no longer required to do. When powers or duties are created solely by statute it would seem to be a plain and reasonable proposition that the same authority that originally granted the power or imposed the duty may recall it and relieve the officer from all obligation with respect to the duty thus imposed. The officer certainly can have no vested right in the exercise of a statutory power or the performance of a statutory duty.

It requires no argument to show that the people of a town, through an act of the legislature, may reduce the expenses of local government and lighten the burden of local taxation, but, in order to do that, they must necessarily reduce the business or fees of the officers to whom the taxes are paid. The act in question does that and nothing more, and, if the legislature has offended the Constitution, that is the head and front of the offending. I cannot bring myself to believe that this court is warranted in declaring such a statute, or any part of it, void. So much legislation of this character has been enacted that I fear such a decision would form a precedent that might be very troublesome hereafter.

There is scarcely a volume of the Session Laws in which

legislation of this character may not be found.   The sheriffs and county clerks are certainly constitutional officers in at least the same sense as a justice of the peace is.   They were all formerly and most of them still are compensated by fees, but no one can doubt that this whole subject is within the scope of legislative power.   The fees may be abolished and a salary, great or small, substituted in their place, and no one would claim that the office was abolished because its money value had been diminished.   Can there be any doubt as to the power of the legislature to provide that fees in criminal cases shall be paid over to the town by the justice of the peace for the benefit of the poor, and a nominal salary substituted in their place?   This would reduce his income in the same sense that the act in question does, but unless the justice had a vested right to all fees prescribed when he went into office the legislation would be valid.

But, whatever may be said about the justice, clearly the constable was not a constitutional officer, and he cannot complain, even if his office was abolished, though it certainly was not.   The legislature could certainly dispense with his services as a peace officer if it thought proper, and provide that in case he elected voluntarily to perform services that he was not bound to perform, that then no fees should be chargeable for such services to the town or county.   It has so declared in a separate and distinct section of the act, and how any provision of the Constitution was violated by such a law it is certainly very difficult to see.

The power and duty of the judiciary, when called upon to deal with the question of the validity of a statute, was well expressed by Judge Andrews in this court in these weighty words: "Only when required by the most cogent reasons, nor, indeed, unless compelled by unanswerable grounds, will a court declare a statute to be unconstitutional."   (*People* v. *Budd*, 117 N. Y. 13.)   There has been, I think, a wide departure from this rule in dealing with the statute in question. The services of both the justice and constable having been performed long after the act in question took effect, their

claims were not valid charges against the town or county, and the respective boards to which they were presented for audit and allowance properly rejected them.

The order of the Appellate Division and that of the Special Term, awarding the mandamus to the relators, should be reversed.

All concur with VANN, J., for affirmance, except O'BRIEN, J., who reads for reversal, and PARKER, Ch. J., and HAIGHT, J., who concur with O'BRIEN, J.

Order affirmed.