Jasen, J. (dissenting).
I dissent and would hold that the appropriations contained in sections 22 and 23 of the New York State Financial Emergency Act for the City of New York and the notes issued to finance these appropriations are in violation of the State Constitution.
In September, 1975, the Legislature, in an Extraordinary Session called to consider the financial plight of New York City, appropriated the sum of $250 million to the city and another $500 million to the Municipal Assistance Corporation (MAC) created for the benefit of the city. (L 1975, ch 868, §§ 22, 23.) In return for these advances, the State took back equivalent amounts of city and MAC notes. The State’s taxes and revenues having been otherwise accounted for to finance *152 the appropriations, the State issued short-term tax and revenue anticipation notes. In my view, these transactions were an ill-disguised effort to evade the limitations imposed by the people of this State, in their Constitution, on the power of State government to arrange its finances. By these arrangements, the State lent its credit to other public corporations and this, under the explicit strictures of our Constitution, it cannot do. Since the appropriation and the notes issued to finance it are in derogation of both the spirit and the letter of the paramount law of this State, our court should strike them down.
Our State Constitution, like the Constitutions of the other States, places restrictions on the power of the State to tax its citizens and to spend public resources. These limitations do not derive from any abstract considerations of how State fiscal affairs should or should not be managed. The constitutional proscriptions, instead, flow from the hard and bitter experiences of the people of this State when, on prior occasions in our history, hard times caught up with optimistic fiscal sleight-of-hand. In the formative years in the industrial development of New York, the State, through a variety of financial schemes, issued bonds and stocks to finance railroads, banks, turnpikes, hospitals, and other private enterprises then deemed essential for society. Contrary to expectations, these businesses defaulted on their obligations and the State, or rather its taxpayers, were required to make good on the securities. Moreover, the State was required to invest still more public money lest the value of its earlier investments be lost. As the extent of the State’s obligations became fully known, a storm of opposition arose to the policy of advancing State money or State credit to private enterprise. (2 Lincoln, Constitutional History of New York, pp 93-101; see, also, Problems Relating to Taxation and Finance, Documents of the New York State Constitutional Convention Committee [1938], vol X, pp 108-112.) This opposition developed because taxpayers "were finally incensed at the thought that they would have to shoulder the burdens of the bad investments of the State” (at p 110). In 1843, the State Comptroller noted that, in most cases, loans of State credit had not resulted in benefits to the State, but, rather, had "inflicted lasting evils on all who labor and pay taxes.” (New York State Assembly Documents [1843], No. 10, p 33.) Thus, in 1846, the Constitutional Convention of that year adopted, without much discussion or debate, *153 a provision prohibiting loans of State credit: "The credit of the state shall not, in any manner, be given or loaned to, or in aid of any individual, association, or corporation.” (NY Const of 1846, art VII, § 9.)
Doubts later arose as to whether the constitutional prohibition applied to public corporations. In one case, this court held that it did not. (Board of Supervisors of County of Cayuga v State of New York, 153 NY 279, 293-294.) After the Great Depression had displayed, with great force, the weakness of the financial foundation underlying many local governments, the members of the 1938 Constitutional Convention deemed it advisable to extend the constitutional prohibition to public corporations. The Committee on State Finances and Revenues reported that were the prohibition not extended, "the State credit could be given or loaned to every municipal or other public corporation. If cities found themselves in difficulties, or if an authority were unable to sell its securities, they could rush to the State for assistance. One or two instances might do no harm, but a general use of the State credit in this manner would dissipate the State’s credit and demolish the strongest foundation of our State’s financial structure. The committee feels strongly that the State’s credit should be reserved for the use of the State only, with only such exceptions as may be specifically set forth in the Constitution.” (Journal and Documents of the New York State Constitutional Convention [1938], Appendix 3, Doc No. 3, p 6.) Contrary to the assertion of the majority that the prohibition was intended only to guard against the easy imposition of burdens upon future generations by present leaders (p 144), it is unmistakably clear that the prohibition was primarily designed to insure that the credit of the State would be reserved for the sole use of the State government. Nowhere was it even suggested that short-term loans of credit ought to be permitted. The framers sought to guard against the dissipation and abuse of the State’s hard-won credit. In the absence of express constitutional sanction, no other entity, corporate or governmental, was to be given access to it, whether access was for a year, or 2, or 20. What was feared was that cities, unable to borrow on their own credit or unable or unwilling to raise taxes, might induce and secure the loan of sound State credit to bolster up their own sagging credit, thereby threatening the financial structure of the State. The "declared intention” of the draftsmen was to prohibit "the use of the credit of one *154 unit to supplement the credit of another unit.” (Union Free School Dist. v Town of Rye, 280 NY 469, 478.)
As it has come down to us, the Constitution of our State provides that State money "shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking” (NY Const, art VII, § 8, subd 1). The 1967 Constitutional Convention proposed a new section that would have weakened the force of this prohibition.[1] That section, along with the rest of that proposed Constitution, was rejected by the people.
It should be recognized that the Constitution does not prohibit the State from loaning or giving money to other public corporations. However, such an explicit prohibition was unnecessary since the power to give or loan is necessarily controlled by the resources available to make the gifts or loans. There is no difficulty with the State giving or loaning money to a locality for a public purpose, provided that the State has, legitimately, adequate funds available to do so. (See Union Free School Dist. v Town of Rye, 280 NY 469, 474, supra.)
I believe that the legislation involved in this case and notes issued in pursuance of the legislative scheme are in violation of the constitutional prohibition. This case does not involve a mere gift or loan of State money, for it is clear that the State had no money to give. The arrangement provided for in sections 22 and 23 of the New York State Financial Emergency Act for the City of New York can, most appropriately, be classified as an exchange. The city and its Municipal Assistance Corporation were unable to find purchasers for their own securities in the public marketplace. (See L 1975, ch 868, § 1; Public Authorities Law, § 3031.) The State still could. The State took from the city and MAC $750 million in securities and then, anticipating the revenue to be derived from the eventual sale of the State-held MAC bonds and from the interest accruing on the MAC and city notes,[2] issued its own notes. (See L 1975, ch 868, §§ 22, 23.)
*155 In September, 1975, the State issued $250 million in revenue anticipation notes. These were absorbed by the general investing public. In October, the State issued another $250 million of revenue anticipation notes. These were purchased by the State Comptroller, acting on behalf of the State Common Retirement Fund. In November, $250 million in tax anticipation notes were sold to the Commissioner of Taxation and Finance, the State Thruway Authority and the State Teachers’ Retirement System. The State was serving as the mere conduit for a flow-through of securities from the city and MAC to other purchasers. The State was placing its credit behind that of the city and MAC. In effect, the State was merely laundering city and MAC notes and bonds, taking such notes and bonds in with its left hand, and selling its notes with its right.
The revenues generated by the sale of the State notes were never intended to be applied for the benefit of the State coffers generally. The prospectus distributed with the September offering stated that the proceeds would be used solely to pay the special appropriation made to the city by the Legislature. (State Prospectus of September 10, 1975, p 3.) The evident purpose of the Financial Emergency Act was to get vitally needed funds to the city at a time when the city could not borrow the funds and the State could. That the purpose was achieved by a resort to the State’s credit is obvious and indisputable. The money advanced to the city was produced solely by resort to the State’s credit. No amount of words can disguise that essential fact. Even if the technical letter of the scheme is considered obscure, its substance is plain. It is also plain that, despite the majority’s effort to gloss over the invasion of credit with an articulate veneer of words, the credit of the State was loaned in direct violation of the command of our State Constitution.
A more difficult question would be presented had the State made the appropriation as part of the normal budgeting process and did not earmark the proceeds of the notes for the particular purpose of assisting public corporations. Yet, in this case, the State issued anticipation notes with the express condition that their proceeds should be given to two specific *156 public corporations, New York City and MAC. "The evasion of the constitutional prohibition [is] palpable and * * * should not be permitted.” (People v Westchester County Nat. Bank, 231 NY 465, 476.)
The invasion made in this case on the State’s credit is exactly the sort of invasion that the draftsmen feared. It does not require an extensive economic analysis to realize that the short-term notes issued by the State in aid of the city might pre-empt the market. The danger is that when the time comes for the State to issue short-term notes in order to carry on the legitimate purposes of State government, it might well find that the securities market could not, or would not, handle any further short-term notes issued by New York State. By reserving the State’s credit for the sole use of the State government, the draftsmen were not being needlessly parsimonious or niggardly. Rather, the provision was designed to make sure that the State’s credit would be there when the State needed it. The action of the Legislature and the court’s decision today sustaining it weakens the force of that protection.
The majority takes the position that there is no constitutional violation since the State is given express constitutional sanction to issue short-term notes in anticipation of taxes and revenues. (NY Const, art VII, § 9.) However, this argument is not persuasive for two reasons. First, the Constitution prohibits all loans of credit, whether financed by short-term notes or long-term notes. If an exception should be made to permit short-term loans of credit, the exception should be made by the people, for it is their Constitution and its protection is for their benefit. "The courts did not make the Constitution; the courts may not unmake the Constitution.” (Sgaglione v Levitt, 37 NY2d 507, 514.) Secondly, short-term anticipation notes can only be issued "within the amounts of appropriations theretofore made.” (NY Const, art VII, § 9.) Although appropriations were made, the appropriations were not made previous to the issuance of the notes, but, rather, virtually simultaneously with their issuance. Section 9 recognizes that receipts do not arrive necessarily at the same time expenditures are to be made. Thus, if appropriations are made in the budget, and the allocated revenue is not collectible until a few months later, the Constitution permits a temporary borrowing. In my opinion, it is a distortion of the limited borrowing permitted by section 9 to authorize the Legislature to add new and *157 massive appropriations after the budget has been adopted and cover them with anticipation notes.
The majority is able to salvage the validity of the legislation and the notes only through the benefit of some rather attenuated reasoning. Although a court, as the majority again cautions, should not " 'strain * * * to find illegality’ ”in statutory financing programs (p 145; Comereski v City of Elmira, 308 NY 248, 254), it also should not strain to place a cloak of legitimacy around a constitutionally defective practice. The majority, in an apparent effort to dissuade the Legislature from ever doing this again, states that the State "in avoiding violation has been driven to the brink of valid practice” (p 142). However, what is valid once can be valid twice. Rather than having been taken to the brink once, I submit that the State has been pushed over the precipice, and it might happen again and again. I believe this court should refuse to sanction, even on a one-time basis, actions which are clearly taken in violation of the State Constitution.
The State Constitution is the fundamental and paramount law of this State. The courts cannot close their eyes to the Constitution and see only the acts and doings of the Legislature. (See Marbury v Madison, 1 Crunch [5 US] 137, 178.) Otherwise, the Constitution would offer but a frail protection and citizens would "be at the mercy of ingenious efforts to circumvent its object and to defeat its commands.” (People ex rel. Burby v Howland, 155 NY 270, 281.)
I do not doubt that efforts to assist New York City at the time of severe and almost overwhelming economic difficulty are acts undertaken in the public interest, acts designed to effectuate a legitimate State purpose. The city has found itself in a fiscal crisis of unprecendented magnitude. The consequences of a final bankruptcy would be devasting, not only to the people of the city, but to the people of the State and to the Country as a whole. It has taken the combined effort of both the State and Federal Governments to restore a measure of fiscal stability to that financially troubled city. The State’s continued participation in the efforts to restore the city to fiscal health is essential. However, in assisting the city, the State should act within its own resources, lest it too be swept away by a rising tide of indebtedness. It is for this very reason that people of our State imposed limitations on the power of the State government to utilize its credit and to contract debt. The State is bound to act within these limitations, "for noth *158 ing is more certain than that beneficent aims, however great or well directed, can never serve in lieu of constitutional power.” (Carter v Carter Coal Co., 298 US 238, 291; Matter of Fink v Cole, 302 NY 216, 225.) "However important, however useful the objects designed by the legislature, they may not be accomplished by * * * a loan of credit * * * to a [public] corporation.” (People v Westchester County Nat. Bank, 231 NY 465, 475, supra.) Expediency is no substitute for constitutional authority.
It should be pointed out that there are valid, constitutionally permissible means of assisting New York City. To obtain the necessary wherewithal to aid New York City, the State could have raised taxes or could have reduced expenditures in other areas. Such decisions are, of course, often politically and socially painful. That they are does not mean that they should be avoided. To be sure, the people of our State already bear the burden of a staggering amount of taxation. Understandably, the Legislature is extremely reluctant to add to that burden. On the other hand, a reduction in expenditures would necessitate the elimination of programs and cause a diminution in the level of services provided to the people, a result equally bitter to contemplate. However, as becomes clearer with each passing day, we do not live in a world of infinite resources. The State must, as all must, set a level of priority and apply whatever resources are available to meeting the néeds that are the most vital. This is the essence of the budgetary process. The answer is not to make loans of credit in the brittle hope that in a year’s time the situation will improve. That approach is not only unconstitutional, it is shortsighted. By loaning its credit to New York City, the State might jeopardize its own financial security. A crisis in the securities marketplace, a marketplace already unreceptive to securities issued by the State of New York, might not only topple New York City, but New York State as well. The consequences of a State bankruptcy or even a temporary inability on the part of State government to finance its own operations, the true purpose for which anticipation notes may be issued, will permanently scar the people of this State. If the State must reduce expenditures or increase taxes in order to obtain the funds to aid New York City, the cost is still less than the price to be paid by a State-wide financial catastrophe. If the people are aroused by these temporary measures, it *159 is not difficult to image their anger when, as in the past, they discover that as a result of gimmickry designed to deceive them, the State has been shorn of its financial foundation. The constitutional provision here under consideration was designed in part to ensure that the difficult decisions would be made, that the legislative and executive leadership would not take the easy way out. To sustain the sort of financial legerdemain involved here is to encourage the type of practice that, in part, has created the financial crisis before us.
I am well aware that the amount of money at issue is enormous and that the implications of a declaration of unconstitutionality are of grave significance. However, the duty of the court in a constitutional democracy is also clear. When confronted with a legislative enactment in clear violation of the State Constitution, I believe that the court has no choice but to strike it down, notwithstanding the political, social or economic ramifications of the decision. To do otherwise is to challenge the rule of law by which all, legislators as well as individual citizens, must abide. The very magnitude of the illegality cannot serve as its shield. If the rule were otherwise, the larger violations, the ones most to be feared, would be immune from judicial scrutiny. Moreover, the holding of our court today does nothing that will discourage or deter the Legislature from developing and using ingenious methods to evade the constitutional limitations, secure in knowledge that our court will not strike them down. The court’s decision today, while salvaging the financial scheme immediately before us, will, I fear, ultimately do a greater injury by depriving the people of a measure of their protection against State fiscal mismanagement.
For the reasons stated, I dissent.
Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur with Chief Judge Breitel; Judge Jasen dissents and votes to reverse in a separate opinion.
Judgment affirmed.

. The 1967 revision would not have prevented the State from "loaning” its credit to public corporations. It would have prohibited only the issuance of guarantees of the obligations of local governments. (Proposed 1967 Const, art X, § 18, subd a, par [2].)

. The proposed 1976-1977 State budget makes it clear that the principal on the $250 million in State tax anticipation notes is to be repaid from the proceeds of the eventual sale of the State-held MAC bonds. On the other hand, no specific appropria *155 tion of revenue is made for the repayment of the revenue anticipation notes. A total of $61.8 million is set aside for the payment of interest on all three sets of State-issued securities. (1976-1977 Executive Budget, at pp 644-645.)