39 N.Y.2d 136 (1976)
Leon E. Wein, Appellant,
v.
State of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued January 13, 1976.
Decided March 23, 1976.
Leon Edward Wein, pro se, and William J. Quirk for Leon E. Wein, appellant.
Louis J. Lefkowitz, Attorney-General (Shirley Adelson Siegel and Samuel A. Hirshowitz of counsel), for Arthur Levitt, respondent.
Martin Kleinbard, Max Gitter and Dean B. Allison for the Municipal Assistance Corporation for the City of New York, amicus curiae.
Haliburton Fales, 2d, Willis McDonald, IV, Marion Jay Epley, III, Thomas J. O'Sullivan, Robert L. Clare, III, and John E. Osnato for Certain New York Financial Institutions, amicus curiae.
Judges GABRIELLI, JONES, WACHTLER, FUCHSBERG and COOKE concur with Chief Judge BREITEL; Judge JASEN dissents and votes to reverse in a separate opinion.
*139 Chief Judge BREITEL.
In a taxpayer's action Supreme Court summarily on motion declared constitutional sections 22 and 23 of the State Financial Emergency Act for the City of New York (L 1975, ch 868, as amd by L 1975, ch 870). Plaintiff taxpayer appeals directly to this court urging the statute's *140 unconstitutionality (NY Const, art VI, § 3, subd b, par [2]; CPLR 5601, subd [b], par 2).
In a desperate fiscal crisis the Nation's largest city faces bankruptcy and the State lacks cash resources to tide the city over its immediate problems by outright grant of funds. The issue is whether appropriations, at an Extraordinary Session of the Legislature in mid-fiscal year, of $250 million to the City of New York and $500 million to the Municipal Assistance Corporation for the City of New York (MAC), to be funded by short-term State borrowing in the form of revenue or tax anticipation notes, constitute a gift or loan of the credit of the State to public corporations, in violation of constitutional limitations (NY Const, art VII, § 8, subd 1).
There should be an affirmance. The Constitution does not prohibit the State for a public purpose from giving or lending its money to assist a municipal or other public corporation. Nor does the Constitution prohibit the State from short-term borrowing in advance of anticipated taxes and revenues to fund appropriations previously made. Indeed, short-term borrowing for this purpose is expressly and unconditionally authorized by the literal terms of section 9 of article VII. Hence, if the State chooses to use the proceeds of otherwise constitutionally valid short-term borrowing, payable out of anticipated revenues, in disbursement of an appropriation of money to assist for a public purpose a municipal or other public corporation, the State's "credit" is not extended to the municipality or other public corporation in violation of constitutional limitations. The device is that the State gives cash in hand to the public corporation, albeit obtained by its own borrowing. Such borrowing is permitted in limited fashion by the Constitution, by short-term paper in advance of authentically anticipated revenues from taxes, Federal grants or long-term bonds authorized but not yet issued. The line is a narrow one, but one drawn by the Constitution.
On September 5, 1975, because of the desperate fiscal crisis in New York City, the Legislature convened in Extraordinary Session. On September 9, it passed, and the Governor approved, the New York State Financial Emergency Act for the City of New York, an intricate fiscal plan to meet the city's immediate financial paralysis (L 1975, ch 868, as amd by L 1975, ch 870).
The Legislature declared "that a financial emergency and an emergency period exists in the city of New York. The city *141 is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities" (§ 1). To meet the emergency, $250 million and $500 million were appropriated "in the first instance" as advances to the city and to MAC, respectively (§§ 22, 23). The appropriations were purportedly made from the Local Assistance Fund, an account, and not an actual fund, into which appropriations and disbursements of State aid to local governments are charged and credited (State Finance Law, § 70, subd 3, par [a]). As a precondition to receiving the funds, the city and MAC were required to enter into repayment agreements with the State Budget Director, and to issue notes and bonds payable to the State in the principal amounts of the advances.
No provision was made in the particular statute for the source from which the State expected to obtain the funds to pay the appropriations. This is not unusual in appropriations made by the Legislature. On September 15, 1975, however, the State sold short-term revenue anticipation notes (RANs) in the amount of $250 million, for the purpose of crediting the proceeds to the Local Assistance "Fund" and offsetting a portion of the MAC appropriation. (In October and November, 1975, after Special Term had declared the appropriations sections constitutional, an additional $500 million in short-term notes were sold to fund the remainder of the appropriations.) By general statute, sufficient revenues to pay the particular RANs are available by impounding of the revenues to be received by the State (State Finance Law, § 55; 1934 Opns Atty Gen 190, 191).
Critical to understanding State finances is that the Constitution mandates a balanced budget (art VII, § 2). At the annual regular session of the Legislature, usually not later than February 1, the Governor must present a balanced budget, namely, a plan of expenditures and revenues which balance, with permissible contingencies which do not merit consideration in the present context. Temporary borrowing, discussed later, is permitted to anticipate planned committed revenues and, in certain limited situations, not now relevant, unanticipated needs. There is no express treatment in the Constitution governing appropriations made after the regular session and during the fiscal year at extraordinary sessions, but the implication is, and an essential one, that additional appropriations must be covered by matching revenues, or else the balanced *142 budget of the regular session would be a device easily evaded at a later extraordinary session. A control on such evasion, however, and reinforcing the implication are the constitutional limitations on short-term borrowing.
There is flexibility in the Constitution, as there must be, because estimates of expenditures will never be fulfilled exactly and estimates of revenues will even less likely be fulfilled exactly. And this lack of capacity to prophesy expenditures and revenues in relatively ordinary times is minor when compared to changes of magnitude due to disasters, economic upheavals, war, the coming of peace after war, and the like. The Constitution is designed to permit survival, but it is also designed to prevent the repetition of fiscal abuse the evils of which history taught painfully to the people of this State.
The issues raised in this case involve the principles of the constitutional plan, manipulation of its provisions, and the likelihood of the very abuses the Constitution was intended to prevent. The issues are not easily resolved, and the answers are not categorical. If the city and the State had enormous aggregate temporary debt, without immediate provision for its liquidation or valid refunding in the aggregate, it would be demonstrative that either the constitutional plan is not exact enough to prevent what has happened or that the plan has been violated.
For the reasons to be stated it is concluded that there has been no constitutional violation, but it is also apparent that the State in avoiding violation has been driven to the brink of valid practice.
Plaintiff contends that the appropriations to the city and MAC, funded by short-term State borrowing, constitute a gift or loan of the credit of the State in violation of constitutional limitations. In short, he contends that the State has attempted to do indirectly what it may not do directly.
Section 8 of article VII of the Constitution provides: "The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking".
The prohibition against lending or giving the State's credit was prompted largely by the extensive and highly speculative subsidizing in the first half of the nineteenth century of *143 private railroad and canal companies by the State's long-term debt obligations (see People v Westchester County Nat. Bank, 231 N.Y. 465, 471-472; Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of New York [1846], at pp 884-894; New York State Constitutional Convention Comm, Problems Relating to Taxation and Finance [1938], vol 10, ch V; New York Temporary State Comm on the Constitutional Convention, State Finance [1967], p 108; Sowers, Financial History of New york State, pp 82-85; Bidwell, Taxation in New York State, pp 32-33; 2 Lincoln, Constitutional History of New York, pp 91-101, 179-180; see, also, Johns Hopkins Univ. v Williams, 199 Md 382, 388-390). For example, to aid the construction of railroads, the State would issue or "loan" to the railroad "State stock", a form of long-term debt instrument backed by the State's full faith and credit. The public would then purchase the State stock from the railroad at auction, and the proceeds would be applied to the private corporation's capital improvements (e.g., L 1836, ch 170, §§ 1, 4, 7).
It was not anticipated that the State would ever have to pay the debt to the purchasers of the State stock from its own tax-raised funds (see Problems Relating to Taxation and Finance [1938], op. cit., at p 109; Debates and Proceedings [1846], op. cit., at pp 856, 1085; Proceedings and Debates of the Constitutional Convention of 1867, vol 3, at p 1844). This was because, in return for the stock, the railroads promised to pay the annual interest and to redeem the principal before it became due, thus exonerating the State of its liability (e.g., L 1836, ch 170, § 9). In the words of Mr. Hoffman, Chairman of the 1846 Convention Committee on Finances, "The people stand in this case as security for those debts" (Debates and Proceedings [1846], op. cit., at p 852). Mortgages of railroad real property were given to secure the promises.
In the halcyon days of economic boom, stimulated by the improvements which presaged the eventual industrial and commercial development of the State, the practice of subsidizing internal transportation improvements foretold no fiscal difficulties, and seemed very much in the public interest. With the onset of the depression of 1837-1842, however, the railroads, too rapidly and profligately built, were unable to pay their debts. The State paid. Foreclosure of the railroad mortgages was futile, as they covered only real property, practically worthless apart from the rolling stock. Public funds thus *144 disbursed were never reimbursed and the people became disillusioned with the policy of subsidizing private internal improvements, however seemingly desirable. As a consequence, section 9 of article VII of the Constitution of 1846 was adopted to prohibit the lending or giving of the State's credit to corporations (see People v Westchester County Nat. Bank, 231 N.Y. 465, 471-472, supra; Debates and Proceedings [1846], op. cit., at pp 853-856; Revised Record of the New York State Constitutional Convention of 1915, vol 2, at pp 1255-1256; Problems Relating to Taxation and Finance [1938], op. cit., at pp 109-112; Lincoln, op. cit., at pp 98-101, 179-180).
In 1938, following the Great Depression with memories then fresh of the financial stringencies of municipal corporations, the prohibition against lending or giving the State's credit was for the first time made applicable to public corporations (NY Const, art VII, § 8). The 1938 Convention Committee on State Finances and Revenues reported: "If corporations were defined as only private corporations, by immediate implication the State credit could be given or loaned to every municipal or other public corporation. If cities found themselves in difficulties, or if an authority were unable to sell its securities, they could rush to the State for assistance. One or two such instances might do no harm, but a general use of the State credit in this manner would dissipate the State's credit and demolish the strongest foundation of our State's financial structure. The committee feels strongly that the State's credit should be reserved for the use of the State only, with only such exceptions as may be specifically set forth in the Constitution" (Journal and Documents of the New York State Constitutional Convention [1938], Appendix 3, Doc No. 3, at p 6).
The foregoing historical summary indicates that the prohibition was intended to protect the State from the uncertain and possibly disastrous consequences of incurring future contingent liabilities, liabilities easy for a current generation to project but a burden on future generations.
The State Comptroller, Arthur Levitt, in his 1975 Annual Report, quoted the eighteenth century philosopher, David Hume, to pertinent effect: "It is very tempting to a minister to employ such an expedient, as enables him to make a great figure during his administration, without overburthening the people with taxes, or exciting any immediate clamors against himself. The practice therefore of contracting debt will almost infallibly be abused, in every government. It would scarcely be *145 more imprudent to give a prodigal son a credit in every banker's shop in London, than to empower a statesman to draw bills, in this manner, upon posterity."
The prohibition against extending the State's credit is not, however, limited solely to instances where the State acts as a surety or guarantor of the debt of others, or to situations where the debt is noncontigent, as had been the case in the early days (see People v Westchester County Nat. Bank, 231 N.Y. 465, 476, supra; Temporary State Comm., State Finance [1967], op. cit., at pp 113-114, n 41; compare Proposed NY Const of 1967, art X, § 18, which would have expressly prohibited the State only from guaranteeing the obligations of municipal or other public corporations). In People v Westchester County Nat. Bank (231 N.Y. 465, 483, supra), the court interpreted section 8 of article VII to apply not only where the State has guaranteed the debt of others, but also where the State has issued its own long-term bonds and made a gift of the proceeds. As the court stated (p 476): "[T]he mere form of the transaction is immaterial. If the gift of the bonds of the state to a railroad corporation would be such a gift  and it undoubtedly would be  then so would be an issue of bonds by the state with the express condition that their proceeds should be given to the same corporation. The evasion of the constitutional provision would be palpable and it could not and should not be permitted" (see 81 CJS, States, §§ 136-137, p 1167, n 50).
Of course, the Westchester Bank case was an application of the familiar rule of statutory construction that, when the main purpose of a statute, or a part of a statute, is to evade the Constitution by "effecting indirectly that which cannot be done directly, the act is to that extend void, because it violates the spirit of the fundamental law" (People ex rel. Burby v Howland, 155 N.Y. 270, 280). On the other hand, there is an exceedingly strong presumption that a statute is constitutional (see, e.g., Montgomery v Daniels, 38 N.Y.2d 41, 54; People v Broadie, 37 N.Y.2d 100, 117). And, as stated in Comereski v City of Elmira (308 N.Y. 248, 254): "We should not strain ourselves to find illegality in such [statutory financing] programs" (see Wein v City of New York, 36 N.Y.2d 610, 619).
It is undisputed that the State may give or lend money, as distinguished from its credit, to assist a municipal or other public corporation in a public purpose (People v Westchester County Nat. Bank, 231 N.Y. 465, 472-474, supra; Journal of the *146 Constitutional Convention [1938], op. cit., Appendix 3, Doc No. 3, at p 5; Temporary State Comm, State Finance [1967], op. cit., at p 114; see, also, Wein v City of New York, 36 N.Y.2d 610, 619, supra; Comereski v City of Elmira, 308 N.Y. 248, 252, supra; Union Free School Dist. v Town of Rye, 280 N.Y. 469, 474; Salzman v Impellitteri, 203 Misc 486, 495, affd 281 App Div 1023, mod and affd 305 N.Y. 414; 1938 Opns Atty Gen 256, 257). Under the Constitution, any such monetary assistance must, of course, be made pursuant to an appropriation, which must distinctly specify the sum appropriated and the object or purpose to which it is to be applied (art VII, § 7). These requirements were met in the instant case (see L 1975, ch 868, §§ 22, 23, as amd by L 1975, ch 870).
It is also undisputed that the State may validly contract debts in authentic anticipation of the receipt of taxes and revenues, for the purpose and within the amounts of appropriations previously made (NY Const, art VII, § 9). Notes issued in exchange for the moneys so borrowed must, however, under the Constitution and by implementing statute, be paid from such taxes and revenues within one year from the date of issue (art VII, § 9; see State Finance Law, § 55). This is the key device in the Constitution with respect to temporary financing. If properly observed, temporary obligations may not become long term and a burden on future taxpayers who undoubtedly will have their own fiscal problems to solve.
The concern expressed in the Westchester Bank case (supra), namely, that the State's credit would be impaired and posterity burdened by the improvident use of long-term borrowing to finance gifts of the State's money, is obviated by using constitutionally valid short-term borrowing to finance appropriations of money to assist municipal or other public corporations (see Revised Record [1915], op. cit., at pp 1269-1271; Problems Relating to Taxation and Finance [1938], op. cit., at p 69, n 8). Unlike long-term borrowing, which is limited in term to a period of "the probable life of the work or purpose for which the debt is to be contracted", constitutionally valid short-term borrowing, which must be repaid within one year, imposes no "burden upon our children" (NY Const, art VII, § 12; People v Westchester County Nat. Bank, 231 N.Y. 465, 474, supra). Indeed, the constitutional limitations on short-term borrowing were carefully designed to avoid this problem (see discussion below). Moreover, the proceeds of constitutionally valid short-term borrowing once raised are *147 cash in hand. Temporary notes validly issued in authentic anticipation of taxes and revenues to be received within one year, are therefore functionally equivalent to the commitment of incoming taxes and revenues. Hence, the use of short-term borrowing to finance an appropriation of money to a municipal or other public corporation does not violate the prohibition against giving or lending the State's credit, provided the short-term borrowing is authentically in anticipation of actually committed taxes or other revenues.
On the face of it, then, the appropriations of money to assist the city and MAC, ultimately financed in part by the RANs, would appear to be a constitutionally valid reimbursable grant of the State's money for a public purpose to municipal and public corporations. Section 9 of article VII requires, however, that short-term debt must be contracted "in anticipation of the receipt of taxes and revenues". The resolution of the issues in this case thus revolves entirely on the validity and use of anticipation notes to fund the emergency appropriations under attack.
In the Constitution of 1846, under an exception to the referendum requirement applicable to long-term bonds, the State was authorized to incur up to $1 million of debt "to meet casual deficits or failures in revenues, or for expenses not provided for" (art VII, § 10). The $1 million limit on such debt was not, however, considered applicable to temporary borrowing in anticipation of revenues or to cover unanticipated budgetary deficiencies. Thus, large debts were incurred by means of issuing tax anticipation notes (see 1915 Opns Atty Gen 161, 162-164; Problems Relating to Taxation and Finance [1938], op. cit., at pp 67-68; Temporary State Comm, State Finance [1967], op. cit., at p 75). This practice had been termed a violation of the "spirit" of the Constitution (Problems Relating to Taxation and Finance [1938], op. cit., at p 68).
To remedy the situation, the provision was revised in 1920 expressly to permit the State to contract short-term debt in anticipation of taxes and revenues. Instead of a $1 million limit, which had become anomalously small, the short-term debt was limited to the amount of appropriations previously made and presumably in accordance with a balanced budget plan. For reasons that history makes clear, obligations issued for the money borrowed were required to be paid from taxes and revenues within one year of the date of issue (NY Const of 1894, art VII, § 2, as amd; see Revised Record [1915], op. *148 cit., at pp 1270-1271). It was believed that the revised provision would suffice to cover customary tax anticipation loans as well as budget deficit loans (Problems Relating to Taxation and Finance [1938], op. cit., at p 70).
With the onset of the Great Depression and the resulting large annual budgetary deficits, however, it became evident that tax and revenue anticipation loans, which had to be repaid within one year, were inadequate to close large fiscal gaps. The State was forced to "rollover", that is, replicate what was supposed to be a one-instance temporary debt until it was finally retired. In 1938, a proposal was made to give the State the authority to contract five-year loans to finance budgetary deficits, but this proposal was never adopted. Instead, a bifurcated provision was made for bond anticipation notes, that is, notes in anticipation of proceeds from bonds authorized by referendum and limited by term to the probable usefulness of the project for which the bonds were authorized, payable within two years from the date of issue of the bond anticipation notes. The one-year limitation for "customary" tax and revenue anticipation notes was retained (NY Const, art VII, § 9; see Problems Relating to Taxation and Finance [1938], op. cit., at pp 71-72; Journal of the Constitutional Convention [1938], op. cit., Appendix 3, Doc No. 3, at p 6).
Thus, the device of issuing tax and revenue anticipation notes was designed to permit the State to borrow temporarily to meet expenses for which appropriations under a balanced budget have been made, but for which revenues, both committed and anticipated, have not yet come in, thus adjusting the cash flow of taxes and revenues to expenditures. Put another way, these short-term obligations may be used to raise funds to offset temporary deficits in the fiscal year of issuance and payable not later than in some early portion of the next fiscal year (see 1932 Opns Atty Gen 119). According to the Constitution, however, and this is of critical significance, tax and revenue anticipation notes must be issued "in anticipation of the receipt of taxes and revenues"; they may not be issued in anticipation of a budgetary deficit (see Temporary State Comm, State Finance [1967], op. cit., at p 86).
Consequently, if it cannot reasonably be anticipated at the time the notes are issued that the State will have sufficient committed taxes and revenues, based on authentic estimates, to pay the obligations within one year of the date of issue, such borrowing is constitutionally impermissible. For example, *149 if repayment of tax and revenue anticipation notes may only be made by creating, directly or indirectly, a budgetary deficit in the year of repayment, such borrowing is not an anticipation of the receipt of taxes and revenues and thus violates constitutional limitations (see Governor's Budget Message 1976-1977, at p M10, recognizing and endeavoring to meet the problem). As was stated by the 1938 Subcommittee on Taxation and Finance of the Constitutional Convention Committee: "The spirit of the clause implied that the State must not have two or more budgetary deficits in succession. Unless the State intended that it would have sufficient revenue to retire the deficit loans, it really had no power to contract them" (Problems Relating to Taxation and Finance [1938], op. cit., at p 71). (For an example of an intractable deficit carry-over, see State Comptroller's 1975 Report, vol 1, at p 8, with reference to fiscal years 1972-1973, 1973-1974.)
Of course, such a violation of the "spirit" of this provision would be compounded by another tax or revenue anticipation note issue to offset a budgetary deficit in the second year, thus in effect "rolling over" the initial issue. In short, "rollovers" of revenue and tax anticipation notes are not consonant with constitutional limitations or their spirit. Of course, it would be naive not to recognize that the ingenuity of man can devise at least a verbalistic escape from limitations and perhaps even an escape through the inevitable loopholes in man's language to accomplish his purpose. But there must be a point, a determinable point, at which an otherwise plausible manipulation may and will be recognized and declared to be the doing indirectly of that which is forbidden to be done directly (see People v Westchester County Nat. Bank, 231 N.Y. 465, 476, supra; People ex rel. Burby v Howland, 155 N.Y. 270, 280, supra).
The $250 million of RANs in the instant case, the only notes before Special Term, were validly issued in authentic anticipation of revenues to be received within one year of their date. The Governor has estimated that the 1975-1976 budget is currently in deficit in the amount of $449 million. To meet the deficit and balance the budget the Governor has proposed drawing upon an estimated $67 million in liquid assets of tax stabilization funds, and issuing $382 million in additional tax notes in anticipation of committed taxes and revenues (Budget Message, at p M10).
At the time the RANs were offered by prospectus, on *150 September 10, 1975, the State had $3,385 million of tax and revenue anticipation notes outstanding, in some large measure undoubtedly a product of previous short-term financing (see State Prospectus of September 10, 1975 for the instant notes, at p 5, n 1, projecting a refinancing of part of temporary notes maturing in September by tax anticipation notes, conceivably a "rollover" of notes, but notes not involved in this case). Nevertheless, on August 31, 1975, 10 days before the issuance of the RANs, for the then current fiscal year 1975-1976 there were taxes and revenues anticipated but not received of $6,422.1 million. The total recommended expenditures for fiscal year 1976-1977 are $10,764 million, including coverage of anticipation notes already issued and to be issued; the total anticipated revenues are $10,764 million (Budget Message, at pp A50-A51, A75). If there are insufficient funds to repay the RANs when they fall due, the Comptroller will issue refunding notes and begin to impound taxes and revenues to repay the refunding notes. Thus, it does not appear that at the time of the issuance of the RANs, the State could not reasonably have anticipated that there would be sufficient taxes and revenues to pay the particular RANs within one year of the date of issue, or at least at this stage of the matter the court cannot say so. The $250 million of RANs were, therefore, validly issued within the meaning of constitutional limitations.
The point then is that these RANs are not identifiable, at this initial stage, as part of a "rollover", but are a new financing to meet a new emergency appropriation. There is, of course, more to the problem.
To balance the budget for the new fiscal year (1976-1977), it is anticipated that the ultimate funds for the payment of the RANs will come from the anticipated proceeds of MAC notes issued to the State in September, 1975 and which will mature in September, 1976 (see L 1975, ch 868, § 23). If so, the situation is fine. If not, when these RANs become due they would be payable, on default, out of first impounded revenues. Of course, were the fiscal paralysis of the city to renew, the temptation for temporary refinancing in the nature of a "rollover" might occur, but such a pessimistic prophesy is the privilege of the financial soothsayer and not of a court applying the rules of law. It is interesting that with respect to city notes issued to the State as part of the October, 1975 transaction, they are further secured by the power of the State to *151 withhold State aid due to the city (§ 22). With respect to MAC there is no similar provision but, instead the hope that MAC will be able to sell its bonds to reimburse the State on the temporary notes.
One may not leave the subject without observing that the device under scrutiny, even if it is not identifiable at this stage as a violation of constitutional limitations in control of the State's temporary debt, may in the course of time prove violative if it becomes the starting point for temporary refinancing in the nature of a "rollover". The device is not justified because of the extreme fiscal emergency but only because the particular appropriations and the particular RANs are in fact not violative of constitutional limitations. Their validity depends upon the prospect that the particular RANs will be paid as contemplated and there is nothing now at hand to suggest that they will not. Indeed, if the constitutional mandate for a balanced budget is obeyed, they must be paid.
In sum, there is no unconstitutional granting of the State's credit to MAC or the city, and there is no unconstitutional abuse of the temporary borrowing power of the State. The first is true because the State may grant or lend its funds in hand for a public purpose to a public corporation. The second is true because the State's temporary debt as a part of the device must be exonerated in the ensuing fiscal year. The legalities of the device are present so long as the fiscal prospects are tenable.
Accordingly, the judgment of Supreme Court should be affirmed, without costs.
JASEN, J. (dissenting).
I dissent and would hold that the appropriations contained in sections 22 and 23 of the New York State Financial Emergency Act for the City of New York and the notes issued to finance these appropriations are in violation of the State Constitution.
In September, 1975, the Legislature, in an Extraordinary Session called to consider the financial plight of New York City, appropriated the sum of $250 million to the city and another $500 million to the Municipal Assistance Corporation (MAC) created for the benefit of the city. (L 1975, ch 868, §§ 22, 23.) In return for these advances, the State took back equivalent amounts of city and MAC notes. The State's taxes and revenues having been otherwise accounted for to finance *152 the appropriations, the State issued short-term tax and revenue anticipation notes. In my view, these transactions were an ill-disguised effort to evade the limitations imposed by the people of this State, in their Constitution, on the power of State government to arrange its finances. By these arrangements, the State lent its credit to other public corporations and this, under the explicit strictures of our Constitution, it cannot do. Since the appropriation and the notes issued to finance it are in derogation of both the spirit and the letter of the paramount law of this State, our court should strike them down.
Our State Constitution, like the Constitutions of the other States, places restrictions on the power of the State to tax its citizens and to spend public resources. These limitations do not derive from any abstract considerations of how State fiscal affairs should or should not be managed. The constitutional proscriptions, instead, flow from the hard and bitter experiences of the people of this State when, on prior occasions in our history, hard times caught up with optimistic fiscal sleight-of-hand. In the formative years in the industrial development of New York, the State, through a variety of financial schemes, issued bonds and stocks to finance railroads, banks, turnpikes, hospitals, and other private enterprises then deemed essential for society. Contrary to expectations, these businesses defaulted on their obligations and the State, or rather its taxpayers, were required to make good on the securities. Moreover, the State was required to invest still more public money lest the value of its earlier investments be lost. As the extent of the State's obligations became fully known, a storm of opposition arose to the policy of advancing State money or State credit to private enterprise. (2 Lincoln, Constitutional History of New York, pp 93-101; see, also, Problems Relating to Taxation and Finance, Documents of the New York State Constitutional Convention Committee [1938], vol X, pp 108-112.) This opposition developed because taxpayers "were finally incensed at the thought that they would have to shoulder the burdens of the bad investments of the State" (at p 110). In 1843, the State Comptroller noted that, in most cases, loans of State credit had not resulted in benefits to the State, but, rather, had "inflicted lasting evils on all who labor and pay taxes." (New York State Assembly Documents [1843], No. 10, p 33.) Thus, in 1846, the Constitutional Convention of that year adopted, without much discussion or debate, *153 a provision prohibiting loans of State credit: "The credit of the state shall not, in any manner, be given or loaned to, or in aid of any individual, association, or corporation." (NY Const of 1846, art VII, § 9.)
Doubts later arose as to whether the constitutional prohibition applied to public corporations. In one case, this court held that it did not. (Board of Supervisors of County of Cayuga v State of New York, 153 N.Y. 279, 293-294.) After the Great Depression had displayed, with great force, the weakness of the financial foundation underlying many local governments, the members of the 1938 Constitutional Convention deemed it advisable to extend the constitutional prohibition to public corporations. The Committee on State Finances and Revenues reported that were the prohibition not extended, "the State credit could be given or loaned to every municipal or other public corporation. If cities found themselves in difficulties, or if an authority were unable to sell its securities, they could rush to the State for assistance. One or two instances might do no harm, but a general use of the State credit in this manner would dissipate the State's credit and demolish the strongest foundation of our State's financial structure. The committee feels strongly that the State's credit should be reserved for the use of the State only, with only such exceptions as may be specifically set forth in the Constitution." (Journal and Documents of the New York State Constitutional Convention [1938], Appendix 3, Doc No. 3, p 6.) Contrary to the assertion of the majority that the prohibition was intended only to guard against the easy imposition of burdens upon future generations by present leaders (p 144), it is unmistakably clear that the prohibition was primarily designed to insure that the credit of the State would be reserved for the sole use of the State government. Nowhere was it even suggested that short-term loans of credit ought to be permitted. The framers sought to guard against the dissipation and abuse of the State's hard-won credit. In the absence of express constitutional sanction, no other entity, corporate or governmental, was to be given access to it, whether access was for a year, or 2, or 20. What was feared was that cities, unable to borrow on their own credit or unable or unwilling to raise taxes, might induce and secure the loan of sound State credit to bolster up their own sagging credit, thereby threatening the financial structure of the State. The "declared intention" of the draftsmen was to prohibit "the use of the credit of one *154 unit to supplement the credit of another unit." (Union Free School Dist. v Town of Rye, 280 N.Y. 469, 478.)
As it has come down to us, the Constitution of our State provides that State money "shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking" (NY Const, art VII, § 8, subd 1). The 1967 Constitutional Convention proposed a new section that would have weakened the force of this prohibition.[1] That section, along with the rest of that proposed Constitution, was rejected by the people.
It should be recognized that the Constitution does not prohibit the State from loaning or giving money to other public corporations. However, such an explicit prohibition was unnecessary since the power to give or loan is necessarily controlled by the resources available to make the gifts or loans. There is no difficulty with the State giving or loaning money to a locality for a public purpose, provided that the State has, legitimately, adequate funds available to do so. (See Union Free School Dist. v Town of Rye, 280 N.Y. 469, 474, supra.)
I believe that the legislation involved in this case and notes issued in pursuance of the legislative scheme are in violation of the constitutional prohibition. This case does not involve a mere gift or loan of State money, for it is clear that the State had no money to give. The arrangement provided for in sections 22 and 23 of the New York State Financial Emergency Act for the City of New York can, most appropriately, be classified as an exchange. The city and its Municipal Assistance Corporation were unable to find purchasers for their own securities in the public marketplace. (See L 1975, ch 868, § 1; Public Authorities Law, § 3031.) The State still could. The State took from the city and MAC $750 million in securities and then, anticipating the revenue to be derived from the eventual sale of the State-held MAC bonds and from the interest accruing on the MAC and city notes,[2] issued its own notes. (See L 1975, ch 868, §§ 22, 23.)
*155 In September, 1975, the State issued $250 million in revenue anticipation notes. These were absorbed by the general investing public. In October, the State issued another $250 million of revenue anticipation notes. These were purchased by the State Comptroller, acting on behalf of the State Common Retirement Fund. In November, $250 million in tax anticipation notes were sold to the Commissioner of Taxation and Finance, the State Thruway Authority and the State Teachers' Retirement System. The State was serving as the mere conduit for a flow-through of securities from the city and MAC to other purchasers. The State was placing its credit behind that of the city and MAC. In effect, the State was merely laundering city and MAC notes and bonds, taking such notes and bonds in with its left hand, and selling its notes with its right.
The revenues generated by the sale of the State notes were never intended to be applied for the benefit of the State coffers generally. The prospectus distributed with the September offering stated that the proceeds would be used solely to pay the special appropriation made to the city by the Legislature. (State Prospectus of September 10, 1975, p 3.) The evident purpose of the Financial Emergency Act was to get vitally needed funds to the city at a time when the city could not borrow the funds and the State could. That the purpose was achieved by a resort to the State's credit is obvious and indisputable. The money advanced to the city was produced solely by resort to the State's credit. No amount of words can disguise that essential fact. Even if the technical letter of the scheme is considered obscure, its substance is plain. It is also plain that, despite the majority's effort to gloss over the invasion of credit with an articulate veneer of words, the credit of the State was loaned in direct violation of the command of our State Constitution.
A more difficult question would be presented had the State made the appropriation as part of the normal budgeting process and did not earmark the proceeds of the notes for the particular purpose of assisting public corporations. Yet, in this case, the State issued anticipation notes with the express condition that their proceeds should be given to two specific *156 public corporations, New York City and MAC. "The evasion of the constitutional prohibition [is] palpable and * * * should not be permitted." (People v Westchester County Nat. Bank, 231 N.Y. 465, 476.)
The invasion made in this case on the State's credit is exactly the sort of invasion that the draftsmen feared. It does not require an extensive economic analysis to realize that the short-term notes issued by the State in aid of the city might pre-empt the market. The danger is that when the time comes for the State to issue short-term notes in order to carry on the legitimate purposes of State government, it might well find that the securities market could not, or would not, handle any further short-term notes issued by New York State. By reserving the State's credit for the sole use of the State government, the draftsmen were not being needlessly parsimonious or niggardly. Rather, the provision was designed to make sure that the State's credit would be there when the State needed it. The action of the Legislature and the court's decision today sustaining it weakens the force of that protection.
The majority takes the position that there is no constitutional violation since the State is given express constitutional sanction to issue short-term notes in anticipation of taxes and revenues. (NY Const, art VII, § 9.) However, this argument is not persuasive for two reasons. First, the Constitution prohibits all loans of credit, whether financed by short-term notes or long-term notes. If an exception should be made to permit short-term loans of credit, the exception should be made by the people, for it is their Constitution and its protection is for their benefit. "The courts did not make the Constitution; the courts may not unmake the Constitution." (Sgaglione v Levitt, 37 N.Y.2d 507, 514.) Secondly, short-term anticipation notes can only be issued "within the amounts of appropriations theretofore made." (NY Const, art VII, § 9.) Although appropriations were made, the appropriations were not made previous to the issuance of the notes, but, rather, virtually simultaneously with their issuance. Section 9 recognizes that receipts do not arrive necessarily at the same time expenditures are to be made. Thus, if appropriations are made in the budget, and the allocated revenue is not collectible until a few months later, the Constitution permits a temporary borrowing. In my opinion, it is a distortion of the limited borrowing permitted by section 9 to authorize the Legislature to add new and *157 massive appropriations after the budget has been adopted and cover them with anticipation notes.
The majority is able to salvage the validity of the legislation and the notes only through the benefit of some rather attenuated reasoning. Although a court, as the majority again cautions, should not "`strain * * * to find illegality'" in statutory financing programs (p 145; Comereski v City of Elmira, 308 N.Y. 248, 254), it also should not strain to place a cloak of legitimacy around a constitutionally defective practice. The majority, in an apparent effort to dissuade the Legislature from ever doing this again, states that the State "in avoiding violation has been driven to the brink of valid practice" (p 142). However, what is valid once can be valid twice. Rather than having been taken to the brink once, I submit that the State has been pushed over the precipice, and it might happen again and again. I believe this court should refuse to sanction, even on a one-time basis, actions which are clearly taken in violation of the State Constitution.
The State Constitution is the fundamental and paramount law of this State. The courts cannot close their eyes to the Constitution and see only the acts and doings of the Legislature. (See Marbury v Madison, 1 Cranch [5 US] 137, 178.) Otherwise, the Constitution would offer but a frail protection and citizens would "be at the mercy of ingenious efforts to circumvent its object and to defeat its commands." (People ex rel. Burby v Howland, 155 N.Y. 270, 281.)
I do not doubt that efforts to assist New York City at the time of severe and almost overwhelming economic difficulty are acts undertaken in the public interest, acts designed to effectuate a legitimate State purpose. The city has found itself in a fiscal crisis of unprecendented magnitude. The consequences of a final bankruptcy would be devasting, not only to the people of the city, but to the people of the State and to the Country as a whole. It has taken the combined effort of both the State and Federal Governments to restore a measure of fiscal stability to that financially troubled city. The State's continued participation in the efforts to restore the city to fiscal health is essential. However, in assisting the city, the State should act within its own resources, lest it too be swept away by a rising tide of indebtedness. It is for this very reason that people of our State imposed limitations on the power of the State government to utilize its credit and to contract debt. The State is bound to act within these limitations, "for nothing *158 is more certain than that beneficent aims, however great or well directed, can never serve in lieu of constitutional power." (Carter v Carter Coal Co., 298 US 238, 291; Matter of Fink v Cole, 302 N.Y. 216, 225.) "However important, however useful the objects designed by the legislature, they may not be accomplished by * * * a loan of credit * * * to a [public] corporation." (People v Westchester County Nat. Bank, 231 N.Y. 465, 475, supra.) Expediency is no substitute for constitutional authority.
It should be pointed out that there are valid, constitutionally permissible means of assisting New York City. To obtain the necessary wherewithal to aid New York City, the State could have raised taxes or could have reduced expenditures in other areas. Such decisions are, of course, often politically and socially painful. That they are does not mean that they should be avoided. To be sure, the people of our State already bear the burden of a staggering amount of taxation. Understandably, the Legislature is extremely reluctant to add to that burden. On the other hand, a reduction in expenditures would necessitate the elimination of programs and cause a diminution in the level of services provided to the people, a result equally bitter to contemplate. However, as becomes clearer with each passing day, we do not live in a world of infinite resources. The State must, as all must, set a level of priority and apply whatever resources are available to meeting the needs that are the most vital. This is the essence of the budgetary process. The answer is not to make loans of credit in the brittle hope that in a year's time the situation will improve. That approach is not only unconstitutional, it is shortsighted. By loaning its credit to New York City, the State might jeopardize its own financial security. A crisis in the securities marketplace, a marketplace already unreceptive to securities issued by the State of New York, might not only topple New York City, but New York State as well. The consequences of a State bankruptcy or even a temporary inability on the part of State government to finance its own operations, the true purpose for which anticipation notes may be issued, will permanently scar the people of this State. If the State must reduce expenditures or increase taxes in order to obtain the funds to aid New York City, the cost is still less than the price to be paid by a State-wide financial catastrophe. If the people are aroused by these temporary measures, it *159 is not difficult to image their anger when, as in the past, they discover that as a result of gimmickry designed to deceive them, the State has been shorn of its financial foundation. The constitutional provision here under consideration was designed in part to ensure that the difficult decisions would be made, that the legislative and executive leadership would not take the easy way out. To sustain the sort of financial legerdemain involved here is to encourage the type of practice that, in part, has created the financial crisis before us.
I am well aware that the amount of money at issue is enormous and that the implications of a declaration of unconstitutionality are of grave significance. However, the duty of the court in a constitutional democracy is also clear. When confronted with a legislative enactment in clear violation of the State Constitution, I believe that the court has no choice but to strike it down, notwithstanding the political, social or economic ramifications of the decision. To do otherwise is to challenge the rule of law by which all, legislators as well as individual citizens, must abide. The very magnitude of the illegality cannot serve as its shield. If the rule were otherwise, the larger violations, the ones most to be feared, would be immune from judicial scrutiny. Moreover, the holding of our court today does nothing that will discourage or deter the Legislature from developing and using ingenious methods to evade the constitutional limitations, secure in knowledge that our court will not strike them down. The court's decision today, while salvaging the financial scheme immediately before us, will, I fear, ultimately do a greater injury by depriving the people of a measure of their protection against State fiscal mismanagement.
For the reasons stated, I dissent.
Judgment affirmed.
NOTES
[1] The 1967 revision would not have prevented the State from "loaning" its credit to public corporations. It would have prohibited only the issuance of guarantees of the obligations of local governments. (Proposed 1967 Const, art X, § 18, subd a, par [2].)
[2] The proposed 1976-1977 State budget makes it clear that the principal on the $250 million in State tax anticipation notes is to be repaid from the proceeds of the eventual sale of the State-held MAC bonds. On the other hand, no specific appropriation of revenue is made for the repayment of the revenue anticipation notes. A total of $61.8 million is set aside for the payment of interest on all three sets of State-issued securities. (1976-1977 Executive Budget, at pp 644-645.)