81 N.Y.2d 336 (1993)
In the Matter of Robert L. Schulz et al., Appellants,
v.
State of New York et al., Respondents.
In the Matter of Robert L. Schulz et al., Appellants,
v.
State of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued February 9, 1993.
Decided May 11, 1993.
Robert L. Schulz, John Salvador, Jr., Gilbert O. Boehm and William Busch, appellants pro se in the first above-entitled matter.
Robert Abrams, Attorney-General, Albany (Peter G. Crary, Jerry Boone and Peter H. Schiff of counsel), for respondents in the first above-entitled matter.
Robert L. Schulz, John Salvador, Jr., and Gilbert O. Boehm, appellants pro se in the second above-entitled matter.
Robert Abrams, Attorney-General, Albany (Frank K. Walsh, Jerry Boone and Peter H. Schiff of counsel), for respondents in the second above-entitled matter.
Chief Judge KAYE and Judges SIMONS, TITONE and HANCOCK, JR., concur with Judge BELLACOSA; Judge SMITH dissents in a separate opinion.
*342 BELLACOSA, J.
In these cases, a group of citizens challenges State financing schemes embodied in chapter 190 (Schulz Appeal No. 1) and chapter 220 (Schulz Appeal No. 2) of the Laws of 1990. The lawsuits have failed up to now for lack of threshold standing to sue. Appellants advance several theories to support their standing to sue on discrete aspects of the lawsuits, and argue on the merits that the various public financing statutes violate provisions of the New York State Constitution pertaining to how the State may incur debt. We conclude that the appellants in Schulz Appeal No. 1 should be accorded *343 standing only on a constitutional voter basis. However, we affirm the order of the Appellate Division in that appeal on the sole ground of laches. In Schulz Appeal No. 2, we dismiss the appeal for lack of a preserved substantial constitutional question.[*]

I.
Supreme Court dismissed those portions of the pleading challenging sections of chapter 190 of the Laws of 1990 (the Act) which deal with the extension of State credit and longterm debt without voter approval. The dismissal was predicated on the authority of State Finance Law § 123-b, New York State Coalition for Criminal Justice v Coughlin (64 N.Y.2d 660) and Wein v Comptroller of State of N. Y. (46 N.Y.2d 394). In particular, the challenges to sections 349 and 356, as well as portions of sections 339, 342 and 371 of chapter 190, were dismissed. The Supreme Court, however, found that "the remaining statutory provisions challenged by the petitioners do not address the `authorization, sale, execution or delivery of a bond issue' [State Finance Law § 123-b] and petitioners do not seek to litigate that issue".
On the State defendants' appeal to the Appellate Division, that Court reversed, finding that the challenges to all sections of the Act were interrelated and could not be effectively separated, since they "all stem from the initial issuance of the bonds in question". For standing purposes analysis only, we likewise treat those aspects as interrelated. The Appellate Division on that basis dismissed the entire proceeding (Matter of Schulz v State of New York, 180 AD2d 42, 44). Appellants in Schulz Appeal No. 1 appeal from that Appellate Division order as of right on constitutional grounds (CPLR 5601 [b] [1]). The claim to standing as voters is expressly asserted in their primary pleading in this proceeding. The challengers asserted that they are registered voters and that they "have standing to maintain this action as voters who have been denied their right to vote in a referendum[] submitted to the people at a general election pursuant to Section 11 of Article VII of the State Constitution".
*344 The challenge in the proceeding underlying Schulz Appeal No. 2 sought to invalidate various sections of chapter 220 of the Laws of 1990 establishing the New York Local Government Assistance Corporation for the issuance of $4.7 billion in bonds. Both lower courts dismissed that proceeding outright on lack of standing. Significantly, plaintiffs in this case failed to allege their voter status as an express theory of standing in their pleadings in that case. The appeal from the Appellate Division order in that matter is also taken as of right on constitutional grounds (CPLR 5601 [b] [1]).
Because appellants in Schulz Appeal No. 1 asserted at the first opportunity in the pleadings their standing as voters pursuant to New York Constitution, article VII, § 11 that precise claim is preserved with respect to the order of the Appellate Division stemming from the State defendants' appeal in that Court and the appeal from that order lies as of right. Because plaintiffs did not expressly allege voter standing in the proceeding underlying Schulz Appeal No. 2, no substantial constitutional question is presented and we thus dismiss that appeal and deny the motion for leave to appeal made at oral argument.

II.
Schulz Appeal No. 1 to this Court, properly before us, requires us to decide the standing-to-sue issue in the context of the challenge to various sections of chapter 190 of the State Laws of 1990. The Appellate Division dismissed that lawsuit in its entirety. The Act provides for the sale and leaseback of Attica Correctional Facility and Interstate Highway 287 by the State to a State-created public corporation. These sales were designed to generate $200 million and $30 million cash, respectively, as nonrecurring revenues, so called "one shots". The purchases were financed by bond issues of the Urban Development Corporation during the fiscal year 1990-1991. The appraisal of the standing issue presents a difficult and complicated question which is affected by weighty precedential and statutory factors.
Until 1976, this Court consistently "held that the constitutionality of a State statute may be tested only by one personally aggrieved thereby, and then only if the determination of the grievance requires a determination of constitutionality" (St. Clair v Yonkers Raceway, 13 N.Y.2d 72, 76, cert denied 375 US 970). In Boryszewski v Brydges (37 N.Y.2d 361), this Court *345 loosened the reins, stating: "We hold today that a taxpayer has standing to challenge enactments of our State Legislature as contrary to the mandates of our State Constitution" (id., at 362 [emphasis added]). The rationale for the expansive turnabout is simple, critical and compelling:
"We are satisfied that the time has now come when the judicially formulated restriction on standing (which we recognize has had a venerable existence) should be modified to bring our State's practice with respect to review of State Legislative action into conformity not only with the practice in the majority of other States but also with the procedural standing of taxpayers to challenge local actions (General Municipal Law, § 51). We are now prepared to recognize standing where, as in the present case, the failure to accord such standing would be in effect to erect an impenetrable barrier to any judicial scrutiny of legislative action. In the present instance it must be considered unlikely that the officials of State government who would otherwise be the only ones having standing to seek review would vigorously attack legislation under which each is or may be a personal beneficiary" (id., at 364).
Part of the issue today is whether our precedents and legislation after Boryszewski reversed its forward thrust with respect to these public financing challenges. More precisely, the question is whether "voters" may be turned out of court when they have been denied access to the voting booth in alleged violation of an express referendum right conferred by the New York Constitution. To draw from the key language of Boryszewski, should the Executive and Legislative Branches, with the support of our subsequent standing cases, be allowed to erect "an impenetrable barrier to any judicial scrutiny of legislative action[s]" which are alleged to have violated the highest organ of law, the State Constitution itself? We conclude not. History and sound checks-and-balances principles of governance recognize the People as the source of all governmental power. Because the express voter referendum requirement to incur debt contained in article VII, § 11 is inextricably linked to the constitutional grant of debt-incurring authority, we determine that voter standing should be recognized in the proceeding culminating in Schulz Appeal No. 1.
*346 The general constitutional authorization to contract public debt and, likewise, the referendum core of the constitutional limitation on the exercise of that power are contained in article VII, § 11 of the New York Constitution. That section commands essentially that the State may borrow money only when a majority of the voters at a general election approve. The history of State finances and of the State Constitution provide clear evidence of the purport behind these provisions: Public indebtedness is viewed skeptically by the People of New York and must be tightly circumscribed by the People themselves and not entrusted finally even to their elected representatives. The constitutional prerequisite of a public referendum was considered the most effective way to avoid the "over-burdening of future generations by the incurring of long-term debt for capital improvements" (Wein v Levitt, 42 N.Y.2d 300, 304). A similar skepticism applies to borrowing by long-term debt to pay ordinary operating expenses of the government. The People of New York enacted this constitutional provision because history had shown them the governmental officials of the day are often tempted to borrow against the future under circumstances in which the electorate itself needs to exert the ultimate, prudent check-and-balance (see generally, Wein v State of New York, 39 N.Y.2d 136, 141-145; see also, Newell v People ex rel. Phelps, 7 N.Y. 9 [1852]; Bergan, The History of the New York Court of Appeals, 1847-1932, 53 [1985]).
Serious concerns accompany a complete cloak of immunity that would preclude access to judicial review of challenged public financing schemes. Extension of the "taxpayer" standing limitations, to the extent urged by the State here (see, State Finance Law § 123-b; New York State Coalition for Criminal Justice v Coughlin, 64 N.Y.2d 660, supra; Wein v Comptroller of State of N. Y., 46 N.Y.2d 394, supra), logically and practically confers on the Legislature and Executive the power never again to submit their long-term debt financing schemes to the voters. The core provision of article VII, § 11, directing a voters' constitutional referendum as protection against imprudent public financing, would be rendered not just moribund but dead. Since that protection emanates from the People and reserves that ultimate check to themselves, we cannot allow that right to become a dead letter, a mere set of hollow words.
The State defendants strongly counter, however, with the argument that the interests of "taxpayers" and "voters" in *347 participating in the control of excessive or imprudent government debt are logically and virtually identical. Since our own precedents, Wein v Comptroller of State of N. Y. (46 N.Y.2d 394, supra) and New York State Coalition for Criminal Justice v Coughlin (64 N.Y.2d 660, supra), bar "taxpayer" standing to challenge the issuance of bonds or bond anticipation notes, and State Finance Law § 123-b does not explicitly accord standing to taxpayers in such instances, the State contends that "voter" standing in this case is unavailable. In sum, the State's position is that, driven inexorably by the force of the cited authorities, the right to vote on a debt referendum pursuant to article VII, § 11 does not allow for separate and independent standing to sue. We disagree, and note that to the extent that Wein v Comptroller of State of N. Y. (supra), New York State Coalition for Criminal Justice v Coughlin (supra) and State Finance Law § 123-b have been read as a total ban on standing in such cases, they should not be followed, at least with respect to voter standing to sue on financing schemes subject to voter referendum approval.

III.
In Schulz Appeal No. 1, since the appeal lies and the challengers enjoy constitutional voter standing, we would ordinarily turn next to the merits. However, another distinct threshold procedural issue commands our attention  the applicability of the equitable doctrine of laches. Indeed, because of the disposition of the case up to now on lack of standing only, the lower courts did not address the merits of appellants' fiscal challenges and the State has not argued the merits in its briefs to this Court.
The laches hurdle is necessarily implicated. Appellants assert that they started their lawsuit within one year of the enactment of the enabling legislation, within one year of the adoption of the budget for the pertinent fiscal year, within 60 days of the actual sales of bonds, within one month of learning from newspapers about the State's actions, and prior to the adoption of the next annual budget. They insist that should be prompt enough to avoid the laches bar.
Those time periods, however, do not in and of themselves resolve this issue. We must examine and explore the nature and subject matter of the particular controversy, its context and the reliance and prejudicial impact on defendants and others materially affected. Broadly stated, the profound destabilizing *348 and prejudicial effects from delay may be decisive factors. These considerations must be examined for their impact on the State, on the operation and maintenance of orderly government, on those with whom the State engaged in these multimillion dollar financing transactions, and on society in general.
Turning then with further particularity to the application of the laches doctrine in this case, we note that this Court has said:
"Laches is defined as `such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.' * * * The essential element of this equitable defense is delay prejudicial to the opposing party" (Matter of Barabash, 31 N.Y.2d 76, 81).
Because the effect of delay on the adverse party may be crucial, delays of even under a year have been held sufficient to establish laches (see, Matter of Eberhart v La Pilar Realty Co., 45 AD2d 679; Finn v Morgan Is. Estates, 283 App Div 1105).
Chapter 190 of the Laws of 1990 was signed into law on May 25, 1990. The pertinent action attacking that enactment was not commenced until April 29, 1991. During that time, the challenged financing plans were transacted in reliance on the presumed constitutionality and regularity of chapter 190. A total of $377,326,674 in bonds were issued and sold to investors. The sales of Attica Correctional Facility and Interstate Highway 287 were completed, various other nonbond transactions were also carried out, and proceeds of $200 million and $20 million, respectively, were deposited in the Capital Projects Fund and General Fund.
Appellants' demand for relief on the merits of their constitutional challenge would have the bonds recalled and refunded and the nonbond transactions nullified. Metaphorically, the impossibility of putting genies back in their bottles springs to the imagination. Realistically, constitutional challenges to public financing of such massive and profound dimension, possibly causing traumatic disturbance to settled matters of public finances and governance, should be undertaken reasonably promptly. To relax this procedural safeguard could disproportionately incur or threaten a greater harm to *349 the public weal than the alleged constitutional transgression itself. Undoing such closed financial transactions would also add hundreds of millions of dollars of unplanned expenditures to the taxpayers' burdens. In sum, fiscal year 1990-1991 has come and gone and its financial books in this respect have been closed. Equitable considerations of time, in the laches sense, may justifiably keep them closed and do not warrant, in the circumstances presented here, a piecemeal invalidation challenge as suggested (dissenting opn, at 353).
We find persuasive support in both New York Pub. Interest Research Groups v Levitt (62 AD2d 1074, appeal dismissed 46 N.Y.2d 849) and Burns v Egan (117 AD2d 38, appeal dismissed 68 N.Y.2d 806, lv denied 69 N.Y.2d 602). In both cases, the Appellate Division held that the sale of bonds during the period of delay constituted an important element of the prejudice which warranted application of the doctrine of laches. That is true in this case as well.
In another relevant though different context, this Court addressed the prejudice to State and local governments that occurs when challenges to State financing plans are delayed. The Court, in applying the legal limitations bar, a four-month Statute of Limitations for challenging Medicaid reimbursement rates, stated:
"Of special significance in the present instance is the impact on State and local budgetary planning which application of a six-year Statute of Limitations would introduce. One can visualize the fiscal complexity which would ensue if financial planning for a program with the broad ramifications of Medicaid were subjected to individual challenges for a period of up to six years" (Solnick v Whalen, 49 N.Y.2d 224, 232).
We are unanimous that the pertinent constitutional right should be subject to judicial and popular scrutiny. In contrast to our dissenting colleague, however, we conclude that judicial review may be undertaken only upon a proper and timely invocation, including satisfaction of equitable laches prerequisites in the context of the particular dispute. Only then can alleged constitutional transgressions be addressed and remedied on the merits (see, e.g., Flushing Natl. Bank v Municipal Assistance Corp., 40 N.Y.2d 731, 1088, 1094). The State defendants' arguments persuade us that the time periods involved here do not meet the threshold test in light *350 of the great prejudice certain to be inflicted on the State and its citizens at large when financial transactions of such magnitude and destabilizing impact are at stake and may be upset. Time must be of the essence and here appellants, for all their good-faith intentions in acting expeditiously as pro se litigants, did not satisfy that essential ingredient.
Because laches blocks our review of any of the substantive objections from appellants in this case, we emphasize that no inferences should be speculated upon or drawn as to the merits. Our references to any of the merits arguments, and to the history and the nature of the controversy, pertain solely and necessarily to our contextual consideration and application of the standing and laches doctrines. Notably, inasmuch as standing will now be available to voters, cases may develop in due time in which the courts will have to grapple and come to terms with the merits. We conclude that the time has not come here. So that there should be no misunderstanding or misdirection in view of the dissenting expression, prudence also dictates that we note that this case and our standing precedents, even to the extent expanded today, do not constitute implied endorsements or condemnations of the merits of any of the financing mechanisms that have been the subjects of challenge (see, e.g., New York State Coalition for Criminal Justice v Coughlin, 64 N.Y.2d 660, supra; Wein v Comptroller of State of N. Y., 46 N.Y.2d 394, supra). The Court today says and implies nothing about the constitutionality or merits of these financing mechanisms. Such questions remain open to substantive review and resolution in future cases.
Accordingly, the order of the Appellate Division should be affirmed, without costs, in Schulz Appeal No. 1 on the sole ground that the commencement of the litigation does not satisfy the equitable laches doctrine in the particular context and circumstances of the case. In Schulz Appeal No. 2, the appeal should be dismissed, without costs, on the ground that a preserved substantial constitutional question is not directly involved and the motion for leave to appeal should be denied.
SMITH, J. (dissenting).
In these cases, the constitutionality of the State financing schemes set forth in chapter 190 (Schulz Appeal No. 1) and chapter 220 (Schulz Appeal No. 2) of the Laws of 1990 has been challenged by a group of citizens, appearing pro se (plaintiffs). The State and numerous State officials and agencies are named as defendants. The majority has concluded that plaintiffs have standing to maintain one of *351 these actions "only on a constitutional voter basis" (Schulz Appeal No. 1, majority opn, at 343). Nevertheless, the majority did not reach the merits in either appeal because it concluded that the action in Schulz Appeal No. 1 was barred by laches and that Schulz Appeal No. 2 lacked "a preserved substantial constitutional question" (Schulz Appeal No. 2, majority opn, at 343) and, therefore, warranted dismissal. I concur with the majority to the extent that plaintiffs in Schulz Appeal No. 1 are held to have standing. However, I conclude that substantial constitutional issues have been preserved in Schulz Appeal No. 2 and that, in both Schulz Appeal No. 1 and No. 2, laches should not be a bar to a determination on the merits of these alleged constitutional violations, which are continuing in nature because of their long-term fiscal impact and any continuing authority under the challenged legislation. Therefore, Schulz Appeal No. 1 should be remanded to Supreme Court for a determination on the merits, and Schulz Appeal No. 2 should be remanded to the Appellate Division to address the determination on the merits by Supreme Court. Accordingly, I dissent.
With respect to Schulz Appeal No. 1, various sections of chapter 190 of the State Laws of 1990 (the chapter 190 legislation) permitted the sale and leaseback of Attica Correctional Facility (Attica) and Interstate 287, generating $200 million and $30 million, respectively. This was financed by the issuance of bonds by the Urban Development Corporation and the Thruway Authority. The chapter 190 legislation also authorized the Housing Finance Agency (HFA) to issue up to $500 million in bonds and notes, secured by the State, to fund housing capital program expenditures. As to Schulz Appeal No. 2, chapter 220 of the Laws of 1990 (the chapter 220 legislation) established the New York Local Government Assistance Corporation (LGAC) and authorized it to issue $4.7 billion in bond obligations, payable from State taxes. The challenged statutory provisions in both appeals were not submitted for approval in a voter referendum. Plaintiffs allege that by these actions the State incurred debts in violation of the New York Constitution, article VII, § 11 (voter referendum required to incur State debt); article VII, § 8 (loan of State's credit to a public benefit corporation prohibited); and article X, § 5 (assumption by State of the obligations of a public benefit corporation prohibited).
The chapter 190 legislation became law on May 25, 1990. The petition challenging that legislation was served upon the *352 Attorney-General on April 29, 1991. According to defendants, the sale and leaseback of Attica was completed on February 1, 1991. Plaintiffs allege that the bonds for this deal were sold on February 26, 1991. The Interstate 287 and HFA bonds were issued in March 1991. Indeed, defendants have alleged that the transactions authorized by this legislation were completed and the proceeds disbursed prior to April 29, 1991. This totaled over $377 million in bonds, with the resulting indebtedness of principal and accruing interest payments. Significantly, although HFA was authorized to issue up to $500 million in bonds and notes (see, §§ 370, 371), only approximately $104 million worth had been issued prior to this litigation and the record does not indicate whether further offerings were made in fiscal year 1991-1992, subsequent to the commencement of this proceeding. Moreover, the 1991-1992 budget was not adopted until July 4, 1991. Thus, when this proceeding was commenced, there was a potential for the incursion of additional debt by the further issuance of HFA bonds and the possibility that the 1991-1992 budget could address any problems created by the litigation. Nevertheless, Supreme Court addressed the issue of laches and found no showing of prejudice to the defendants but did find efforts by the defendants to delay a decision on the merits.[1] Specifically, Supreme Court stated the following:
"In order to invoke the doctrine of latches [sic], a litigant must establish that there has been delay, which is prejudicial to it (See: New York Public Interest Research Group v Levitt, 62 AD2d 1074). In the case at bar, respondents/defendants have not established the requisite prejudice, and as such, the motion to dismiss upon the doctrine of latches [sic] must be denied. Indeed, they still do not appear to be in any hurry to reach a determination on the merits, given the fact that they have sought a further delay of this litigation by failing to join issue in an expeditious fashion."
The chapter 220 legislation at issue in Schulz Appeal No. 2 became law on June 11, 1990. On or about February 10, 1992, plaintiffs served the petition upon which that appeal is predicated. Prior to the commencement of this proceeding, $2.4 *353 billion in bonds was sold by LGAC  allegedly during the period between February 21, 1991 and December 12, 1991. However, there were pending transactions. Specifically, as indicated by the February 28, 1992 affidavit of Maryanne Gridley, an Assistant Deputy Comptroller for the State, future bond offerings were in jeopardy because of the temporary restraining order obtained by the plaintiffs. In addition, the February 27, 1992 affidavit of Patrick J. Bulgaro, Director of the Budget of the State of New York, argued against plaintiffs' request for injunctive relief to permit "the last $300 million in LGAC bonds" to be sold. Those bonds were issued in March 1992 and the projected aggregate debt service cost for the years 1992 through 2021 is in excess of $6.4 billion. The Bulgaro affidavit also indicates that in fiscal year 1992-1993 or thereafter up to $1 billion in additional proceeds from bond sales was possible because the legislation authorized a total of $4.7 billion ($1.6 billion obtained in fiscal year 1991-1992 and $2.1 billion prior thereto). Despite these facts, Supreme Court concluded that even though only $2.4 billion of the authorized $4.7 billion in bonds had been sold, it would be prejudicial to halt the sale of other bonds.[2] This ruling was in error.
It is clear that at the time that both of these proceedings were commenced, the issue of the constitutionality of the challenged legislation was viable because the authority to incur debt remained. Under such circumstances, the doctrine of laches should not bar a determination on the merits.
Furthermore, the merits of the defense of laches  delay and prejudice to defendants  must be determined within the context of the plaintiffs' claims. Here, even if defendants' transactions have been completed, plaintiffs' allegation of an unconstitutional and continuing wrong of such magnitude that it will extend into the next century must present a greater concern. Since the alleged violations are constitutional and continuing with respect to the accrual of interest on the debt and the possibility of further actions pursuant to the challenged legislation, there is a dual basis for rejecting the laches defense (see, Matter of Burke v Sugarman, 35 N.Y.2d 39, 45 [laches inapplicable because the "failure to comply with constitutional requirements for making appointments of eligibles to competitive positions is a continuing and constitutional wrong"]). Indeed, in rejecting the application of laches to bar *354 challenges to alleged erroneous appointments because of the continuing failure to adhere to the constitutional requirements, this Court has stated that "though made in good faith [these actions] ought to be open to attack by the petitioners, because as citizens and taxpayers they are entitled to an opportunity to insist upon the construction which this court placed upon the * * * State Constitution" (Matter of Cash v Bates, 301 N.Y. 258, 261). As such, the claims herein should not be barred by laches.
In addition, it is difficult to comprehend, upon reading the record in Schulz Appeal No. 2, how the majority can conclude either that the plaintiffs failed to allege voter standing or that no substantial constitutional question has been preserved. First, the plaintiffs asserted voter standing. Specifically, in the amended complaint of February 10, 1992, plaintiffs Schulz, Salvador and Boehm each alleged that he was "a registered voter registered to vote" in a particular town, that he "voted in the last general election," and that he "is eligible to vote in the next referendum in a general election in New York State."[3] Second, in the first cause of action, the plaintiffs allege a "violation of Article VII, Section 11 of the State Constitution" (requiring a referendum to incur debts, with certain exceptions). This allegation is repeated throughout the complaint. Defendants clearly understood that voter standing was being alleged. In the affirmation in support of the motion to dismiss, defendants argued, "Since plaintiffs have alleged no injury in fact but only allege their citizen taxpayer and voter status as the basis of standing, they have no standing and the complaint must be dismissed." Plaintiffs' supplemental affidavit in opposition to the motion to dismiss addressed the issue of constitutional voter standing by citing New York State Coalition for Criminal Justice v Coughlin (103 AD2d 40, affd 64 N.Y.2d 660) where the Appellate Division did not reach the issue because it was raised for the first time on appeal and was not supported by allegations in the record. Plaintiffs were thus contending that these deficiencies were not present in their case. Indeed, in this case the Appellate Division did reach the issue, albeit unfavorably for plaintiffs (Schulz v State of New York, 185 AD2d 596, 597). Therefore, the issue of voter standing has been before the court since the inception of *355 this litigation (Schulz Appeal No. 2) and the substantive nature of the constitutional contentions is indisputable.
Finally, it must be emphasized that a determination on the merits of these appeals has not been made and none has been suggested. A determination of constitutionality would obviously end the matter, whereas a finding of unconstitutionality would raise the issue of an appropriate remedy. In such a case, the Court is free to consider whether or not such remedy should be purely prospective. What this Court should not do is fail to allow the merits of these constitutional issues to be addressed.
In Appeal No. 1: Order affirmed, without costs.
In Appeal No. 2: Appeal dismissed, without costs, upon the ground that no substantial constitutional question is directly involved. Motion for leave to appeal denied.
NOTES
[*] Despite the Court's dismissal of Schulz Appeal No. 2, the dissent nevertheless addresses a threshold preservation concern that is of no moment, because if that appeal did lie, the result in the case would be the same as the one the Court reaches in Schulz Appeal No. 1, i.e., affirmance on laches only.
[1] The Appellate Division did not address the laches issue in Schulz Appeal No. 1, finding it unnecessary to do so because of its determination that the plaintiffs lacked standing to bring this action.
[2] In Schulz Appeal No. 2, the Appellate Division did not address the issue of laches, instead deciding the case on the issue of standing.
[3] In Schulz Appeal No. 1, the plaintiffs, in addition, allege that they "have standing to maintain this action." Thus, the specific factual allegations as to voter standing are the same in both cases.